Filed 8/15/16

# IN THE SUPREME COURT OF CALIFORNIA

| | | |
|---|---|---|
| CITY OF PERRIS, | ) | |
| | ) | |
| Plaintiff and Respondent, | ) | |
| | ) | S213468 |
| v. | ) | |
| | ) | Ct.App. 4/2 E053395 |
| RICHARD C. STAMPER et al., | ) | |
| | ) | Riverside County |
| Defendants and Appellants. | ) | Super. Ct. No. RIC524291 |
| _____ | ) | |

The City of Perris (the City) is located 70 miles east of Los Angeles. This case involves the City's condemnation of a 1.66-acre strip of defendants' property in order to build a road. By taking the strip, the City has divided the property into two irregularly shaped parcels. The City claimed that defendants would have been required to dedicate the strip to the City, with no compensation, had they sought to put the property to its highest and best use, i.e., light industrial development. The City thus offered to pay defendants the agricultural (undeveloped) value of the strip, relying on *City of Porterville v. Young* (1987) 195 Cal.App.3d 1260 (*Porterville*).) *Porterville* held that when a city takes a portion of undeveloped property, which it would have lawfully required the owner to dedicate to the city as a condition of developing the remainder of the property, the owner is entitled to compensation based on the undeveloped state of the property rather than its highest and best use. (*Id.* at pp. 1265–1269.)

~ SEE CONCURRING AND DISSENTING OPINION ~

The trial court agreed with the City that *Porterville* applies here and that defendants were entitled to a stipulated agricultural value of $44,000 for the taking. In reaching this conclusion, the trial court found the City's dedication requirement to be lawful under *Nollan v. California Coastal Commission* (1987) 483 U.S. 825 (*Nollan*) and *Dolan v. City of Tigard* (1994) 512 U.S. 374 (*Dolan*). Those cases hold that in order to satisfy the Fifth Amendment to the United States Constitution, a dedication requirement must have an "essential nexus" to the valid public purpose that would be served by denying the development permit outright and must be "rough[ly] proportion[al]" to "the impact of the proposed development" at issue. (*Dolan*, *supra*, 512 U.S. at pp. 390, 391; *Nollan*, *supra*, 483 U.S. at p. 837.) The Court of Appeal agreed with the trial court on the applicability of *Porterville* but held that the legality of the dedication requirement under *Nollan* and *Dolan* should have been decided by a jury, not a judge. For this reason, and because of certain evidentiary errors, the Court of Appeal sent the case back to the trial court to revisit the legality of the dedication requirement under *Nollan* and *Dolan*.

We granted review on two questions: First, is the constitutionality of a reasonably probable dedication requirement under *Nollan* and *Dolan* a question that must be resolved by a jury pursuant to article I, section 19 of the California Constitution? Second, was the City's dedication requirement a "project effect" that must be ignored in determining just compensation for the taking under Code of Civil Procedure section 1263.330?

As to the first question, we hold that the essential nexus and rough proportionality inquiries under *Nollan* and *Dolan* are properly decided by a court, not by a jury. Our precedent holds that article I, section 19 of the California Constitution, which governs eminent domain, requires only factually intensive questions directly related to compensation to be submitted to a jury. (See

2

*Metropolitan Water District of So. California v. Campus Crusade for Christ, Inc.* (2007) 41 Cal.4th 954, 971–973 (*Campus Crusade*).) Because the *Nollan* and *Dolan* issues are mixed questions of law and fact in which the legal issues predominate, and because the constitutionality of a dedication requirement is analytically prior to any factual dispute as to whether the condemner would actually impose the requirement, the questions belong to the court.

As to the second question, we hold that the project effect rule generally applies, and *Porterville* does not apply, to situations where it was probable at the time the dedication requirement was put in place that the property designated for public use was to be included in the project for which the property is being condemned. The applicability of the project effect rule thus turns on a preliminary factual question to be decided by the court. Because the trial court believed the project effect rule was categorically inapplicable in this situation, it made no factual findings bearing on the rule's applicability. Such findings may be made on remand.

## I.

In 1985, defendants (the Owners) purchased the property at issue (the Property), a rectangular plot measuring approximately 9.12 acres located north of Ramona Expressway and south of Markham Street. The Property is zoned to allow light industrial development. The Owners originally purchased the Property for their metal fabricating businesses, but the Property remained undeveloped at the time this suit was filed.

## A.

This controversy concerns a 1.66-acre strip of land that the City sought to condemn in 2009 in order to complete construction of a portion of Indian Avenue, a secondary arterial street designed to channel truck traffic toward Harley Knox Boulevard en route to Interstate 215. This strip, which arcs through the Property,

3

comprises roughly 20 percent of the Property and splits the remainder into two roughly triangular parcels — one is 5.5 acres, the other is 2.0 acres — on either side. A map showing the Property and the 1.66-acre strip at issue appears in an appendix to this opinion.

For many years, the City was a predominantly agricultural community, but it has recently experienced significant growth and has developed a more diverse economy. Historically, Indian Avenue was an undeveloped right of way that ran north-south in a straight alignment and did not abut the Property. But in 1999, the City amended its general plan and circulation element by passing resolution No. 2756, which rerouted the Indian Avenue right of way south of Ramona Expressway (the southern realignment) so that it would no longer run straight but would instead curve to the northeast before intersecting Ramona Expressway. A circulation element is a required component of a municipality's general plan and consists of "the general location and extent of existing and proposed major thoroughfares, transportation routes, terminals, any military airports and ports, and other local public utilities and facilities, all correlated with the land use element of the plan." (Gov. Code, § 65302, subd. (b)(1).)

The catalyst for the southern realignment of Indian Avenue was the building of a large distribution center by Lowe's Companies, Inc. (Lowe's), south of Ramona Expressway. In order to develop a site big enough to accommodate its distribution center, Lowe's asked the City to realign Indian Avenue around to the east of the original Indian Avenue right of way south of Ramona Expressway. The City agreed to vacate its original Indian Avenue right of way south of Ramona Expressway, and in return, Lowe's agreed to dedicate to the City the property needed for the southern realignment of Indian Avenue.

Indian Avenue was then partially developed as a road for carrying truck traffic south of Ramona Expressway. At the time of this lawsuit, Indian Avenue

4

remained undeveloped north of Ramona Expressway, where the Property is located. This meant that Indian Avenue ended as it met Ramona Expressway, forming a T-junction.

In 2005, the City passed resolution No. 3430, which adopted an updated circulation element that outlined a number of changes to the future roadway network throughout the City in order to facilitate growth over the next 25 years. As part of the amended circulation element, the Indian Avenue right of way was realigned north of Ramona Expressway (the northern realignment), mirroring the road's curved alignment to the south. Once its northern portion was developed, Indian Avenue would become a continuous, bell-shaped street that would curve to the northeast at the Lowe's distribution center, cross Ramona Expressway, and then curve to the northwest to reconnect with its original north-south alignment at its intersection with Markham Street.

The City conducted studies to determine the ideal path for the northern realignment of Indian Avenue. The City Engineer testified that the objective was to find the "shortest, safest[,] and most logical alignment" for Indian Avenue while minimizing injury to property owners. The City chose an alignment that would utilize the 1.66-acre strip of the Property as well as portions of several other properties that the City eventually acquired by donation or purchase.

On October 14, 2008, the City wrote a letter to the Owners, pursuant to Government Code section 7267.2, offering to buy the 1.66-acre strip for $54,400. On January 9, 2009, the City made a revised offer of $54,800. The Owners did not accept either offer.

On February 19, 2009, the City notified the Owners that a City Council meeting would be held on March 10, 2009, to consider a resolution to acquire the property via condemnation. The resolution said: "The Project will improve traffic flow and ease congestion through the Project Area." In addition, the project "will

5

improve traffic safety, provide a means of access to the properties located adjacent to the Project, and will provide an identity to this revitalized area and enhance property values." The City Engineer who advised the City Council on the resolution further explained in a declaration that "[t]he Indian Avenue right of way, which is currently unimproved between Ramona Expressway and Harley Knox Boulevard . . . must be developed to accommodate the increased traffic flow and public safety issue[s] due to the lack of turnways and increased congestion in the immediate area." Traffic in that area had increased due to "the business parks and industrial complexes that have been completed in the recent year."

In addition to the truck traffic generated by the Lowe's distribution center, traffic was expected to increase due to the construction of the Ridge Commerce Center (Ridge or the Ridge project), which included a 1.9-million-square-foot warehouse and over 1,200 parking spaces. The City approved the Ridge project on the condition that its developers would bear the costs of building Indian Avenue north of Ramona Expressway along the path prescribed by the 2005 amendments to the circulation element. Ridge will therefore bear the costs of any compensation ultimately awarded to the Owners.

Around the time it approved the Ridge project, the City also created the North Perris Road and Bridge Benefit District, which requires developers and businesses in parts of north Perris — parts that include the Property — to contribute to the expense of building roads in the vicinity. Any commercial development on the Property would be conditioned on the Owners' making contributions to the benefit district.

The City Council unanimously adopted the resolution condemning the Property at its March 10, 2009, meeting. This condemnation action was filed shortly thereafter. While the suit was proceeding, the City took possession of the 1.66-acre strip and began building the northern stretch of Indian Avenue. By

6

February 2012, while the Court of Appeal's decision was pending, Indian Avenue was completed. The road is now open to the public.

**B.**

On April 17, 2009, the City filed an eminent domain complaint in the superior court. Among its pretrial motions, the City sought to have the trial court rule on two questions that, if answered in the affirmative, would trigger application of the *Porterville* doctrine: (1) whether the disputed dedication had an essential nexus to the Owners' projected development of their property and was roughly proportional to the impacts of that development under *Nollan* and *Dolan*, and (2) whether it was reasonably probable that the City actually would have imposed such a dedication requirement as a matter of fact. The trial court held that it could decide both questions and, after a bench trial, determined that the dedication requirement was both constitutional and reasonably probable.

As to the issue of just compensation, the Owners filed a motion arguing that the City should be prohibited from introducing evidence that it would have required the 1.66-acre strip to be dedicated before granting the Owners a permit to undertake light industrial activities on the Property. According to the Owners, this evidence violated the project effect rule of Code of Civil Procedure section 1263.330. (All undesignated statutory references are to this code unless otherwise specified.) The trial court denied the motion. The upshot was that a jury would have had to value the 1.66-acre strip based on its agricultural (that is, undeveloped) use. Because the Owners had not prepared testimony regarding the agricultural value of the Property, they stipulated that the value of the 1.66-acre strip was $44,000.00, as suggested by the City's appraiser. On February 23, 2011, the trial court entered judgment in the amount of $44,000.

The Court of Appeal reversed in part and affirmed in part. First, relying on our decision in *Campus Crusade*, *supra*, 41 Cal.4th 954, the Court of Appeal

7

concluded that the trial court had impermissibly "usurped the role of the jury" by deciding the *Nollan* and *Dolan* issues, and by deciding whether there was a reasonable probability that the City would have actually imposed the dedication. The Court of Appeal ordered that on remand, the questions of whether the dedication requirement would have been reasonably probable and whether it was constitutional should be submitted to a jury.

Next, the Court of Appeal held that the trial court had erred in applying *Nollan* and *Dolan* by considering evidence that the City might have agreed to pay the Owners additional compensation at a later date if the Owners proposed a low-impact development on the Property. Neither party has asked us to review that holding.

The Court of Appeal went on to agree with the trial court that the project effect rule does not apply in this case, explaining that the City generally requires all landowners to dedicate rights of way that are shown on the City's circulation element before granting them permission to develop their property. (See Perris Mun. Code, §§ 18.08.040, 18.24.020.) Therefore, the Court of Appeal held, the trial court was correct that evidence of the City's dedication requirement was admissible on the issue of just compensation.

Finally, the Court of Appeal held that the trial court erred in permitting two of the City's witnesses who were not designated as experts — the City Manager, Richard Belmudez, and the City Engineer, Habib Motlagh — to offer expert testimony relevant to the *Nollan* and *Dolan* issues. The Court of Appeal remanded for a new hearing.

We granted review to resolve one of the issues raised by the City's petition for review: whether the constitutionality of a dedication requirement under *Nollan* and *Dolan* must be resolved by the court or by a jury under article I, section 19 of the California Constitution. We also agreed to review one of the issues raised in

8

the Owners' answer to the City's petition: whether the dedication requirement was a project effect that must be ignored in determining just compensation under section 1263.330.

## II.

At the core of this dispute is the City's claim that it would have required the Owners to dedicate — i.e., relinquish without compensation — portions of the Property to the City for road construction, in accordance with the 2005 circulation element, if the Owners had ever sought to develop the Property for light industrial use. Although the Property is zoned for such use, it is undisputed that the Owners could not take advantage of that zoning status without first acquiring a permit from the City. The Owners seek $1.3 million in compensation for the 1.66-acre strip, a value based on the Property being put to its highest and best use. But the City contends that such an amount would provide a major windfall for the Owners because they could never have put the 1.66-acre strip to light industrial use. Such use of the Property, according to the City, would have been premised on the Owners' giving the 1.66-acre strip to the City for free.

We begin with a review of the background law. The Court of Appeal ordered a new hearing on the *Nollan* and *Dolan* questions in light of its findings of evidentiary error, and we did not grant review to decide the constitutionality of the City's dedication requirement. Nevertheless, the high court's takings jurisprudence informs both of the issues on which we granted review, and it provides a useful starting point for understanding the *Porterville* doctrine and the protections that landowners have in this context.

## A.

The takings clause of the Fifth Amendment prohibits a governmental entity from taking private property for public use without just compensation. In construing this prohibition, the high court has held that governmental entities may

9

impose conditions that limit landowners' use of their property so long as the conditions do not cause a "permanent physical invasion" or "completely deprive an owner of '*all* economically beneficial us[e]' of her property." (*Lingle v. Chevron U.S.A. Inc.* (2005) 544 U.S. 528, 538 (*Lingle*), citing *Loretto v. Teleprompter Manhattan CATV Corp.* (1982) 458 U.S. 419 and *Lucas v. South Carolina Coastal Council* (1992) 505 U.S. 1003, 1019.)

When a governmental entity demands that a landowner dedicate a portion of his or her property as a condition of granting a permit to develop the property, there is a "heightened risk that the purpose [of the dedication requirement] is avoidance of the compensation requirement, rather than the stated police-power objective." (*Nollan*, *supra*, 483 U.S. at p. 841.) "Under the well-settled doctrine of 'unconstitutional conditions,' the government may not require a person to give up a constitutional right — here the right to receive just compensation when property is taken for a public use — in exchange for a discretionary benefit conferred by the government where the benefit sought has little or no relationship to the property." (*Dolan*, *supra*, 512 U.S. at p. 385.) For this reason, the high court in *Nollan* held that the constitutionality of a dedication requirement turns on whether there is an "essential nexus" between the dedication and the public purpose that would otherwise be served by denying the permit outright. (*Nollan*, at p. 837; see *Lingle*, *supra*, 544 U.S. at p. 547; *Dolan*, at p. 386.)

Building on *Nollan*, the high court in *Dolan* held that a dedication, in order to satisfy the Fifth Amendment, must have not only an essential nexus to the public purpose that would be served by denying the permit, but also " 'rough proportionality' " to that public purpose. (*Dolan*, *supra*, 512 U.S. at p. 391; see *Lingle*, *supra*, 544 U.S. at p. 547.) "No precise mathematical calculation is required, but the city must make some sort of individualized determination that the required dedication is related both in nature and extent to the impact of the

proposed development." (*Dolan*, at p. 391.) The high court further observed that "[d]edications for streets, sidewalks, and other public ways are generally reasonable exactions to avoid excessive congestion from a proposed property use." (*Id.* at p. 395.) In *Dolan* itself, however, the city had not met its burden of demonstrating the need for such a dedication because it had simply asserted that the dedication requested " ' "*could* offset some of the traffic demand" ' " generated by the landowner's proposed development. (*Ibid.*) This was " ' "a far cry from a finding that the bicycle pathway system *will*, or is *likely to*, offset some of the traffic demand." ' " (*Ibid.*)

We have described the requirements of *Nollan* and *Dolan* as follows: "Where the local permit authority seeks to justify a given exaction as an alternative to denying a proposed use, *Nollan* requires a reviewing court to scrutinize the instrumental efficacy of the permit condition in order to determine whether it logically furthers the *same* regulatory goal as would outright denial of a development permit. A court must also, under the standard formulated in *Dolan*, determine whether the factual findings made by the permitting body support the condition as one that is more or less proportional, in both nature and scope, to the public impact of the proposed development." (*Ehrlich v. City of Culver City* (1996) 12 Cal.4th 854, 868 (plur. opn. of Arabian, J.); see *id*. at p. 912 (conc. & dis. opn. of Werdegar, J.).)

*Nollan* and *Dolan* announce "a type of intermediate scrutiny" of dedication requirements. (*Santa Monica Beach, Ltd. v. Superior Court* (1999) 19 Cal.4th 952, 966; *id*. at pp. 965–967.) When a court applies this intermediate scrutiny, "[t]he proper inquiry is not into the subjective motive of the government agency, but whether there is, objectively, sufficient connection between [the dedication requirement]" and the public purpose that would be served by denying the development permit. (*Landgate, Inc. v. California Coastal Com.* (1998) 17

11

Cal.4th 1006, 1022 (*Landgate*).) "This type of objective inquiry is consistent with the principle that courts do not delve into the individual purposes of decisionmakers in a quasi-adjudicative proceeding, but rather look to the findings made by the governmental agency and determine whether these are based on substantial evidence." (*Ibid.*)

### III.

Turning now to the case before us, we begin with the issue raised by the City: whether the essential nexus and rough proportionality inquiries under *Nollan* and *Dolan* must be submitted to a jury.

The Seventh Amendment to the United States Constitution does not guarantee landowners a jury trial in eminent domain proceedings because no such jury right existed in England or the colonies in 1791. (See *United States v. Reynolds* (1970) 397 U.S. 14, 18 (*Reynolds*).) California's original 1849 Constitution did not guarantee a jury right in eminent domain proceedings for similar reasons. (See *Koppikus v. State Capitol Commissioners* (1860) 16 Cal. 248, 253–254.) But the 1879 drafters of our Constitution amended the original document's takings clause "in reaction to . . . private railroad companies' speculative computation of benefits" in eminent domain cases. (*Los Angeles County Metropolitan Transportation Authority v. Continental Development Corp.* (1997) 16 Cal.4th 694, 705 (*Continental Development*).) The revised takings clause, which now appears in article I, section 19, says in relevant part: "Private property may be taken or damaged for a public use and only when just compensation, ascertained by a jury unless waived, has first been paid to, or into court for, the owner." (Cal. Const., art. I, § 19, subd. (a).) Our Constitution thus guarantees landowners the right to have a jury determine the amount of just compensation owed for a taking.

12

We have long held that this jury right applies only to determining the appropriate amount of compensation, not to any other issues that arise in the course of condemnation proceedings. " '[A]ll issues except the sole issue relating to compensation[] are to be tried by the court,' including, 'except those relating to compensation, the issues of fact.' " (*Campus Crusade*, *supra*, 41 Cal.4th at p. 971; see *Hensler v. City of Glendale* (1994) 8 Cal.4th 1, 15 (*Hensler*); *People v. Ricciardi* (1943) 23 Cal.2d 390, 402; *Vallejo & Northern R. R. Co. v. Reed Orchard Co.* (1915) 169 Cal. 545, 556.) " ' "It is only the 'compensation,' the 'award,' which our constitution declares shall be found and fixed by a jury. All other questions of fact, *or of mixed fact and law*, are to be tried, as in many other jurisdictions they are tried, without reference to a jury." ' " (*Campus Crusade*, at p. 971, italics added.)

Thus, legal questions that affect the type of compensation to which a landowner is entitled in a condemnation action must be decided by the court. "For example, we have held that what constitutes the larger parcel (for purposes of determining severance damages) 'is essentially a question of law for the determination of the court' (*Oakland v. Pacific Coast Lumber and Mill Co.* (1915) 171 Cal. 392, 397); whether separate parcels may be aggregated and considered as one larger parcel is 'an issue of law to be decided by the trial court' (*City of San Diego v. Neumann* [(1993)] 6 Cal.4th [738,] 757); and whether a taking has substantially impaired access to the remaining property is 'a matter of law' for the court (*Breidert v. Southern Pac. Co.* (1964) 61 Cal.2d 659, 664). Similarly, it is for the trial court to decide whether a party had acquired an avigation easement over a neighboring property that was condemned (*Pacific Gas & E. Co. v. Peterson* (1969) 270 Cal.App.2d 434, 438) and, more generally, to determine whether a party had a cognizable legal interest in the condemned property.

13

(*County of San Diego v. Miller* (1980) 102 Cal.App.3d 424, 433.)" (*Campus Crusade*, *supra*, 41 Cal.4th at p. 971.)

Such questions belong to the trial court even when answering them may require the court to examine factual circumstances — i.e., when the legal question is really a "mixed issue[] of law and fact where the legal issues predominate." (*Campus Crusade*, *supra*, 41 Cal.4th at p. 973; see *Emeryville Redevelopment Agency v. Harcros Pigments, Inc.* (2002) 101 Cal.App.4th 1083, 1117 (*Emeryville Redevelopment*).) For example, this court in *Neumann* had to determine as a matter of law whether several parcels the City of San Diego sought to take from the landowners should be aggregated. The trial court was required to determine and weigh several facts bearing on whether the landowners' intended use of the aggregated larger parcel was reasonably probable in the near future, "includ[ing], among other things, evidence of the existing uses of the property, the time and expense necessary for their termination, the physical adaptability of the property for use as an integrated whole, the existing and the proposed zoning applicable to the several parcels in question, local market conditions, the local regulatory climate, and the property owner's plans for development." (*City of San Diego v. Neumann*, *supra*, 6 Cal.4th at p. 757.) Although these were "indeed factual issues," the ultimate question "whether, taken as a whole, they support a finding that a larger parcel exists remained an issue of law to be decided by the trial court." (*Ibid.*)

Similarly, whether access to a property has been "substantially impaired" for purposes of determining severance damages is a question for the court, even though "[s]ubstantial impairment cannot be fixed by abstract definition; it must be found in each case upon the basis of the factual situation." (*Breidert v. Southern Pac. Co.*, *supra*, 61 Cal.2d at p. 664.) In addition, whether a condemner's precondemnation conduct is "unreasonable" and thus triggers precondemnation

14

liability has repeatedly been held to be a question for the court despite the factual aspects of such an inquiry. (See *Redevelopment Agency v. Contra Costa Theatre, Inc.* (1982) 135 Cal.App.3d 73, 79.) And whether a landowner is entitled to damages for loss of goodwill is a question for the court even though it requires a determination of whether a particular loss of goodwill is compensable within the meaning of section 1263.510, subdivision (a). (See *Emeryville Redevelopment*, *supra*, 101 Cal.App.4th at pp. 1116–1117.)

By contrast, *Campus Crusade* held that two pure questions of fact directly pertaining to the proper amount of compensation were reserved to the jury. First, we said that whether it is reasonably probable a city would change the zoning status of the landowners' property in the near future was a jury question. (*Campus Crusade*, *supra*, 41 Cal.4th at pp. 966–967.) Second, because the landowner had introduced credible evidence that the remaining portion of its property would be worth less after the proposed taking due to hazards associated with a pipeline the government proposed to install on the property, the extent of the resulting severance damages was a jury question. (*Id.* at pp. 972–973.)

Applying *Campus Crusade*, the Court of Appeal below held that a jury, not the trial court, should have decided whether it is reasonably probable that the City would have actually attempted to impose the dedication requirement on the Owners had they sought to develop the Property for light industrial use. But the Court of Appeal also held that the trial court had "usurped the role of the jury" by deciding the *Nollan* and *Dolan* issues. We conclude, contrary to the Court of Appeal, that the *Nollan* and *Dolan* issues are for the court, not a jury, to decide because they are mixed questions of law and fact in which the legal issues predominate. Further, they are questions that must be resolved before a condemner is entitled to even argue that, as a matter of fact, it would have actually imposed the disputed dedication requirement.

15

Whether a dedication requirement meets the essential nexus and rough proportionality tests is a matter of means-ends scrutiny familiar to constitutional adjudication.  This inquiry requires a court to evaluate whether a legislative or quasi-adjudicative body has made sincere and reasoned planning decisions, and to balance landowners' "vulnerab[ility] to the type of coercion that the unconstitutional conditions doctrine prohibits" (*Koontz v. St. John's River Water Management* (2013) 570 U.S. __, __ [133 S.Ct. 2586, 2595]) against the reality "that many proposed land uses threaten to impose costs on the public that dedications of property can offset."  (*Id*. at p. __ [133 S.Ct. at p. 2595].)  Juries are not well equipped to decide such fundamental questions about the limits of lawmaking power.  Indeed, juries are no better equipped to make such determinations than they are to determine whether economic legislation "rests upon some rational basis" (*United States v. Carolene Products Co.* (1938) 304 U.S. 144, 152), whether a state law that impedes the flow of interstate commerce "is clearly excessive in relation to the putative local benefits" (*Pike v. Bruce Church, Inc.* (1970) 397 U.S. 137, 142), or whether an infringement on a fundamental liberty interest, a legislative policy based on a suspect classification, or a content-based restriction on protected speech "is narrowly tailored to serve a compelling state interest" (*Reno v. Flores* (1993) 507 U.S. 292, 302; see *Grutter v. Bollinger* (2003) 539 U.S. 306, 326; *Reno v. American Civil Liberties Union* (1997) 521 U.S. 844, 879).

Although the *Nollan* and *Dolan* inquiries often require the trial judge to find certain facts, the court's primary task is to apply the law to known facts.  In most cases, there is no need to weigh conflicting evidence because the crux of the inquiry is whether "the findings made by the government agency . . . are based on substantial evidence."  (*Landgate*, *supra*, 17 Cal.4th at p. 1022; see *Dolan*, *supra*, 512 U.S. at p. 391 ["the city must make some sort of individualized determination

16

that the required dedication is related both in nature and extent to the impact of the proposed development"].) In other words, a court typically need only determine whether the condemner has done its constitutionally required homework.

It is true that when a condemner invokes *Porterville*, the *Nollan* and *Dolan* inquiries may affect the amount of compensation to which a landowner is entitled insofar as *Porterville* has no applicability where a dedication requirement does not meet constitutional standards. In other words, if a dedication would be unconstitutional if actually imposed, the landowner is entitled to compensation based on the property's highest and best use, not on its unimproved state, and evidence of the dedication would not be admissible on the issue of just compensation. But *all* of the legal questions or mixed questions of fact and law discussed above similarly affect the landowner's compensation by permitting the jury to consider or preventing it from considering certain types of recovery. Those questions are nonetheless reserved to the court because of their legal character and because they are questions that frame the ultimate factual inquiry into the amount of compensation owed. (See *Campus Crusade*, *supra*, 41 Cal.4th at pp. 972–973.) The *Nollan* and *Dolan* inquiries are analytically prior questions that must be answered in order to determine whether a dedication requirement would be a lawful taking if actually imposed as a condition of developing the property. In other procedural contexts, such as an inverse condemnation action, the court would undoubtedly decide such a question. (See *San Diego Gas & Electric Co. v. Superior Court* (1996) 13 Cal.4th 893, 951 ["There is no right to jury trial on the issue whether there has been a taking in the first instance."]; see *Hensler*, *supra*, 8 Cal.4th at p. 15; *Dina v. People ex rel. Department of Transportation* (2007) 151 Cal.App.4th 1029, 1044–1045.) Neither article I, section 19 of the California Constitution nor *Campus Crusade* requires a different rule here simply because the

17

*Nollan* and *Dolan* issues arise by way of the *Porterville* doctrine instead of a direct challenge to the dedication requirement.

Relying on the Court of Appeal decision in *City of Hollister v. McCullough* (1994) 26 Cal.App.4th 289 (*Hollister*), the Owners contend that the *Nollan* and *Dolan* issues are for a jury to decide because they are "a sub-issue within the larger issue of determining the reasonable probability of a dedication requirement." (See *Hollister*, at p. 297 ["[P]roof that a conditional dedication is a 'reasonable probability' requires a showing not only that plaintiff would probably have imposed the dedication condition if defendants had sought to develop the property, *but also* that the proposed dedication requirement would have been constitutionally permissible. This is so because it is not a 'reasonable probability' that a governmental entity would actually succeed in imposing an unconstitutional dedication requirement."].) But the constitutionality of a dedication requirement is not part of the reasonable probability determination, for it is incorrect to say there is no reasonable probability that a condemner would ever succeed in imposing an unconstitutional dedication. The condemner would succeed, for example, if the constitutional dedication were left unchallenged. The constitutionality of the dedication is a separate question and must be separately considered. On this limited point, we disapprove *City of Hollister v. McCullough*, *supra*, 26 Cal.App.4th 289, 297, although we agree with *Hollister*'s main premise that a city may not rely on *Porterville* if the dedication it claims it would have imposed is unconstitutional under *Nollan* and *Dolan*.

Finally, the Owners rely on several federal cases to show that a jury must resolve the *Nollan* and *Dolan* issues. Those cases are of limited relevance because a landowner's right to a jury in a condemnation case is a question of state constitutional law. (See *Reynolds*, *supra*, 397 U.S. at p. 18.) In any event, the substance of those cases does not support the Owners' position.

18

First, the Owners rely on *City of Monterey v. Del Monte Dunes* (1999) 526 U.S. 687, which held that a trial court in a civil rights suit brought under section 1983 of title 42 of the United States Code (section 1983) had properly permitted a jury to consider whether a city's repeated denials of a developer's request for a permit amounted to a regulatory taking. But that holding was based on the Seventh Amendment right to a jury *in section 1983 suits*; the high court made clear it was not addressing the role of a jury in an ordinary condemnation or inverse condemnation suit not brought pursuant to section 1983. (See *Del Monte Dunes*, at pp. 711–712, 721.) Moreover, the landowners in *Del Monte Dunes* did not argue that the city's zoning laws amounted to a regulatory taking; they argued that the city had effected a taking by *not* following its zoning laws. (*Id.* at p. 722.) Thus, the high court "d[id] not address the proper trial allocation of the various questions that might arise" where, as here, it is alleged that "the city's general regulations were unreasonable as applied to [the landowners'] property." (*Ibid.*)

Next, the Owners cite *Skoro v. City of Portland* (D.Or. 2008) 544 F.Supp.2d 1128, a condemnation action in which the court allowed the jury to determine the essential nexus inquiry under *Nollan* with respect to one of the contested dedications. (*Id.* at p. 1137.) But *Skoro*'s holding on this point was simply a denial of summary judgment; the court did not consider whether *Nollan*'s essential nexus inquiry was, as a rule, appropriate for a jury to decide.

Finally, the Owners cite a string of section 1983 cases in which juries have been permitted to address factually intensive mixed questions of fact and constitutional law. But those cases had nothing to do with takings and did not involve applying judicial scrutiny to the acts of a legislative or quasi-adjudicative action.

In sum, we hold that in a condemnation action, the constitutionality of a dedication requirement under *Nollan* and *Dolan* is a question to be decided by a

19

court, not a jury. This question is analytically distinct from, and prior to, the factual determination of whether it is reasonably probable that the condemner would actually impose the dedication as a condition of permitting development of the property at issue.

## IV.

We now consider the Owners' contention that even if the City's dedication requirement is lawful and its imposition is reasonably probable, the project effect rule of section 1263.330 bars the City from introducing evidence of the dedication requirement at a trial on just compensation. In addressing this claim, we begin with further explanation of the law concerning just compensation when a city condemns property that is subject to a lawful dedication requirement.

## A.

The measure of compensation in a condemnation case "is the fair market value of the property taken." (Code Civ. Proc., § 1263.310.) "The fair market value of the property taken is the highest price on the date of valuation that would be agreed to by a seller, being willing to sell but under no particular or urgent necessity for so doing, nor obliged to sell, and a buyer, being ready, willing, and able to buy but under no particular necessity for so doing, each dealing with the other with full knowledge of all the uses and purposes for which the property is reasonably adaptable and available." (*Id.*, § 1263.320, subd. (a).) "A jury should consider all those factors, including lawful legislative and administrative restrictions on property, which a buyer would take into consideration in arriving at the fair market value." (*People ex rel. State Public Works Board v. Talleur* (1978) 79 Cal.App.3d 690, 695–696 (*Talleur*).)

Applying these principles, the Court of Appeal in *Porterville* held that when a city would lawfully have conditioned development of property upon the owner's dedication of a portion of the property, the fair market value of that

20

portion in a subsequent condemnation action is its value in its undeveloped, agricultural state.  (See *Porterville*, *supra*, 195 Cal.App.3d at pp. 1267–1269.) Although this rule is conventionally called the *Porterville* doctrine, its origins predate the *Porterville* case.  (See *City of Fresno v. Cloud* (1972) 26 Cal.App.3d 113, 123 (*City of Fresno*); *People ex rel. Department of Public Works v. Investors Diversified Services, Inc.* (1968) 262 Cal.App.2d 367, 374, 376 (*Investors Diversified*).)  For almost five decades, courts have applied the doctrine to determine the fair market value of dedicated property where the dedication serves to facilitate road construction to offset the impact of developing the rest of the property.  (See *State Route 4 Bypass Authority v. Superior Court* (2007) 153 Cal.App.4th 1546, 1551–1552 (*State Route 4*); *Hollister*, *supra*, 26 Cal.App.4th at p. 297; *Porterville*, at p. 1269; *City of Fresno*, at pp. 119–120; *Investors Diversified*, at pp. 372–373.)

The rationale for this rule is that there is no way the owner could put the dedicated portion to use in a developed state:  "[I]f the remainder of the parcel *is not* developed beyond its present agricultural use, [the] owner will have been paid exactly what the take was worth; if the remainder of the parcel *is* developed for commercial purposes, [the] owner will have been paid for the land he would have been required to dedicate to [the] city to obtain the building permits or conditional use permit necessary for the commercial development."  (*Porterville*, *supra*, 195 Cal.App.3d at p. 1269.)  In other words, because the owner faces a choice of either giving the dedicated portion to the government for free or using that portion in its undeveloped state, the most that a willing buyer would pay for the portion subject to the dedication requirement is its value in its undeveloped state.  If the owner were compensated based on the highest and best use of the property, the owner would get a windfall — i.e., payment based on developed value for property that could not have been developed under any circumstances.  Such a result would be

21

at odds with the Fifth Amendment principle that "[t]he owner is to be put in as good position pecuniarily as he would have occupied if his property had not been taken." (*United States v. Miller* (1943) 317 U.S. 369, 373; see *Continental Development*, *supra*, 16 Cal.4th at p. 704.)

As noted, the applicability of *Porterville* is predicated on two inquiries. First, the dedication requirement must be constitutional under *Nollan* and *Dolan*. Second, there must be "a reasonable probability that development of the property would have been conditioned on dedication of the property taken." (*Hollister*, *supra*, 26 Cal.App.4th at p. 297; see *State Route 4*, *supra*, 153 Cal.App.4th at p. 1551; *Contra Costa County Flood Control and Water Conservation Dist. v. Lone Tree Investments* (1992) 7 Cal.App.4th 930, 936 (*Contra Costa Flood Control*); *Porterville*, *supra*, 195 Cal.App.3d at pp. 1268–1269; *City of Fresno*, *supra*, 26 Cal.App.3d at pp. 120–121.) In other words, it must be reasonably probable that the condemner would actually impose the dedication requirement as a condition of development.

Neither the Owners nor their amici curiae suggest that *Porterville* should be discarded. The Owners acknowledge that a finder of fact may consider certain types of dedication requirements when valuing land in condemnation proceedings. In their briefing, they argue that "typical dedications" "placed on all similarly situated properties based on long-established plans" are admissible in determining just compensation, while "a unique [dedication] requirement growing out of the agency's project" is not.

The Owners and their amici curiae contend, however, that it is improper to apply *Porterville* on the particular facts here. They claim that the City's 2005 decision to realign Indian Avenue in its revision of the City's circulation element, which gave rise to the requirement that the Owners dedicate a portion of the Property to the City as a condition of light industrial development, was part of the

22

"project" at issue here. Thus, they argue, the project effect rule requires the exclusion of any evidence regarding the City's dedication requirement in determining just compensation.

**B.**

The project effect rule is codified in section 1263.330, which states in pertinent part: "The fair market value of the property taken shall not include any increase or decrease in the value of the property that is attributable to any of the following: [¶] (a) The project for which the property is taken. [¶] . . . [¶] (c) Any preliminary actions of the plaintiff relating to the taking of the property." The rule serves to prevent the amount of compensation owed for a taking from being altered by the project served by the taking or by any government action that affects the value of an intended taking. As the Owners explain, if the government is condemning property to build a reservoir, it need not pay lakefront prices for the property. And if the government is condemning property to build a sewage plant, it does not get a discount because its project renders the property less desirable.

The California Law Revision Commission Report's comment on section 1263.330, subdivision (a) makes clear that it was intended to incorporate the rule in *Merced Irrigation District v. Woolstenhulme* (1971) 4 Cal.3d 478 (*Woolstenhulme*). (*Recommendation Proposing the Eminent Domain Law* (Dec. 1974) 12 Cal. Law Revision Com. Rep., pp. 1833–1834 (Law Revision Commission Report).) In *Woolstenhulme*, a plan to increase and stabilize the size of a lake and to develop recreational facilities led to a rise in the value of land near the lake. By 1963, the public became aware of the plan, and land values began to rise. In 1965, it became probable that the defendant's property would be taken for the lake improvement. In 1967, the irrigation district sought to condemn the defendant's land.

23

We reaffirmed in *Woolstenhulme* that a property owner whose property is condemned will not be compensated for any increase in value due to speculation that the property will be taken in order to facilitate development of a proposed project. (*Woolstenhulme*, *supra*, 4 Cal.3d at pp. 490–492.) On the other hand, a property owner can be compensated for increases in valuation that result from a property's proximity to a proposed project, up to the point that it becomes probable the property will be included in the project. (*Id.* at p. 496.) On that basis, the court concluded that the defendant should not be compensated for the increases in value that occurred after 1965. (*Id.* at pp. 498–499.) Although *Woolstenhulme* concerned a limitation on an owner's right to have the value of its property enhanced by probable condemnation, its logic applies equally to limit the condemner's right to capitalize on the diminution of property value after probable condemnation. (Law Revision Com. Rep., *supra*, at pp. 1833–1834 [§ 1263.330 was intended to treat enhancements and diminutions in property value the same].)

Subdivision (c) of section 1263.330, which concerns "preliminary actions by the plaintiff relating to the taking of the property," has a different provenance. Subdivision (c) was enacted verbatim as proposed by the Law Revision Commission, which cited *Buena Park School District of Orange County v. Metrim Corp.* (1959) 176 Cal.App.2d 255, as the basis for its proposal. (Law Revision Com. Rep., *supra*, at pp. 1832, 1835.) In *Metrim*, the preliminary action at issue was the filing of a prior condemnation action, which was dismissed a few days later upon the filing of a second condemnation action. (*Metrim*, at p. 258.) By bringing the initial action, the condemner prevented the property owner from filing a final subdivision map that it otherwise would have filed the next day, with the result of lowering the property's value. (*Ibid.*) *Metrim* explained that the condemner could not benefit from this reduction in property value because it was

24

attributable to "steps taken by the condemning authority toward th[e] acquisition [of the property]." (*Id.* at p. 259.)

Cases applying section 1263.330, subdivision (c) have involved municipal zoning laws explicitly or implicitly enacted for the purpose of suppressing property values before an intended taking. (See *City of San Diego v. Barratt American, Inc.* (2005) 128 Cal.App.4th 917, 937–938; *City of San Diego v. Rancho Penasquitos Partnership* (2003) 105 Cal.App.4th 1013, 1030–1040 [city enacted a zoning ordinance prohibiting development in an area where it anticipated taking land for a state highway]; see also *People ex rel. Department of Public Works v. Graziadio* (1964) 231 Cal.App.2d 525, 529–530 [applying similar principles before § 1263.330's enactment].) Under this line of cases, the condemner exercises its police power for the purpose of furthering the condemnation of property, and subdivision (c) mandates that any effect of such action by the condemner on the value of the property must be discounted.

Just as the date of probable inclusion in a project is important in applying subdivision (a) of section 1236.330, it is also relevant to applying subdivision (c). In general, once it becomes probable that a property will be included, the probable inclusion weighs heavily in favor of the conclusion that subsequent government action that has the potential of devaluing the property is a "preliminary action[] . . . relating to the taking of property" within the meaning of section 1263.330, subdivision (c).

This conclusion is consistent with the *Porterville* doctrine. Courts have applied that doctrine in cases where a dedication requirement was clearly in place before the city contemplated a project for which condemnation may be necessary. In *Porterville* itself, the city condemned a 12-foot wide strip of land to widen a street, and testimony established that had the property been developed, the city would have routinely required developers to dedicate the same strip for the same

25

purpose. (*Porterville*, *supra*, 195 Cal.App.3d 1260, 1263 & fn. 4.) In other cases, the facts are less clear but could be read as establishing that the public agency originally contemplated the construction of a public work prompted by, and contingent on, the development of adjacent property. (See, e.g., *Contra Costa Flood Control*, *supra*, 7 Cal.App.4th 930, 932 [public agency expected to obtain the needed land for a flood control channel by requiring property owners to dedicate land as a valid condition of development].)

Thus, the *Porterville* doctrine applies when the evidence establishes that a dedication requirement reflects an agency original expectation that an improvement would occur as a result of development of adjacent properties in order to mitigate the impact of such development. When it later becomes clear that the properties at issue have to be condemned to undertake the mitigating improvement, the property is valued in its undeveloped state. (Cf. *City of San Diego v. Rancho Penasquitos Partnership*, *supra*, 105 Cal.App.4th at p. 1034 [evidence showed that "the City was attempting to prevent development on properties subject to possible condemnation in order to freeze or depress values"].) Such dedication requirements are not "preliminary actions . . . relating to the taking of property" under section 1263.330, subdivision (c) and can legitimately be considered in the valuation of the property.

Moreover, dedication requirements imposed before inclusion in a project becomes probable cannot be considered part of "the project for which the property is taken" pursuant to section 1263.330, subdivision (a). Nothing in the language or legislative history of subdivision (a) indicates an intent to cover steps taken by a public agency to mitigate the impact of development, independent of any project. Of course, dedication requirements to mitigate the impact of anticipated development must still meet the nexus and rough proportionality tests of *Nollan* and *Dolan*.

26

The situation is different, however, when a dedication requirement is put in place after it becomes probable that the property subject to the dedication will be included in a project, and a city subsequently seeks to condemn the property. We decline to extend the *Porterville* doctrine to that situation.

Thus, in a condemnation action, when a government entity makes a claim under *Porterville* that it would have required a dedication of some or all of the property being condemned had the property been developed, courts determining just compensation should look to whether that dedication requirement was put in place before it was probable that the property would be included in a government project. Probable inclusion in a government project means that at the time the dedication requirement was put in place, (1) the government was engaging in a "project" — that is, a public work the government intended to pursue — for which it intended to acquire property by purchase or condemnation, if necessary, as opposed to a contingent plan to mitigate possible development on adjacent property through dedications; and (2) it was probable the property at issue would be included in that project. Under such circumstances, the project effect rule applies and the *Porterville* doctrine does not.

In this case, the northern realignment of Indian Avenue to include the 1.66-acre strip at issue first appeared in the City's 2005 amendment to the circulation element of its general plan. With that designation came, by operation of the City's ordinance, a requirement to dedicate that strip of land if the larger parcel were developed. Contrary to suggestions in the Owners' brief, this designation of the strip in the 2005 circulation element did not, in itself, establish that it was probable in 2005 that the City would condemn that strip. As the cases above imply, when a public agency designates property for future public use in a planning document, it may well expect to acquire the property through dedications in response to future development rather than by purchase or condemnation. A circulation element is a

27

required component of a city's general plan, which in turn is a "statement of development policies" that sets out a city's "objectives, principles, standards, and plan proposals." (Gov. Code, § 65302.) A circulation element is an anticipatory document, subject to amendment and updating (*id.*, §§ 65301.5, 65358), which provides guidance for future development in light of predicted changes in population, traffic, and other variables. It is not a map of probable future condemnations, and the designation of a future roadway on a circulation element is not necessarily a "preliminary action[] . . . related to the taking of property" under section 1263.330, subdivision (c). For the same reason, such a designation is not necessarily part of a "project for which property is taken" under section 1263.330, subdivision (a).

Nevertheless, other evidence may show it is probable that the property will be included in the project. (See *Woolstenhulme*, *supra*, 4 Cal.3d at p. 498 [approving the trial court's reliance upon evidence of the timetable of the project for which the land was condemned to determine the date of probable inclusion within project]; *People ex rel. Department of Water Resources v. Andresen* (1987) 193 Cal.App.3d 1144, 1154 [testimony regarding the expectations of the parties based on contemporaneous knowledge].) Relevant evidence in this context includes not only facts bearing on when the inclusion of the property became probable, but also the nature and circumstances of the dedication requirement and other evidence bearing on the reasonable expectations of the parties. *Porterville* itself involved a standard frontage dedication requirement imposed on multiple, similarly situated properties, tending to show that these requirements predated and were imposed independently of a plan to condemn the property. (*Porterville*, *supra*, 195 Cal.App.3d 1260, 1263 & fn. 4.) Indeed, the *Porterville* doctrine originated in the context of standard dedication requirements that would be triggered by anticipated favorable zoning changes. (*City of Fresno*, *supra*, 26

28

Cal.App.3d at pp. 118–119; *Investors Diversified Services, Inc.*, *supra*, 262 Cal.App.2d at p. 376; see also *Talleur*, *supra*, 79 Cal.App.3d at pp. 696–697 [Cal. Coastal Act of 1976 predated and was unrelated to condemnation of property].)

By contrast, a nonstandard dedication requirement and a record devoid of an agency's imposition of similar requirements may tend to show that the designation of the property for public use was related to the agency's planned inclusion of the property in an upcoming project. Also, a short period between the time the property is designated for public use and the time the agency first signals its intention to condemn the property may support an inference that inclusion was probable when the dedication requirement was put in place.

Justice Cuéllar takes the view that "[t]he project effect rule has no application where the agency can show that the dedication on which it relies was lawful and would actually have been imposed, independent of the project." (Conc. & dis. opn. of Cuéllar, J., *post*, at p. 6.) He would focus the inquiry on "whether it is 'reasonably probable' that a public agency would actually have imposed the dedication as a condition of development even in the absence of the project." (*Id.* at p. 7.) But readers may legitimately wonder to what extent this formulation will yield results that differ from ones reached under the approach we adopt today, since evidence tending to show that a public agency, at the time of imposing a dedication, planned to condemn the property for inclusion in the project will also tend to diminish the inference that the agency would have imposed the dedication independent of the project. In any event, we see no reason why, under section 1263.330, a dedication requirement cannot sometimes be considered a project effect. Nor do we see a basis to conclude that the trial court's consideration of the timing and circumstances of the agency's imposition of the dedication requirement, in accordance with the project effect rule, will result in a windfall to property owners.

29

Because the date of a property's probable inclusion within a project is a preliminary factual determination that pertains to the admissibility of evidence regarding valuation, it is for the trial court rather than the jury to determine. (*Woolstenhulme*, *supra*, 4 Cal.3d at p. 498, fn. 12; see also *ante*, at pp. 16–17 [preliminary legal questions in condemnation actions, even when factual inquiry is required, are for the court].)  In this case, the parties do not appear to agree on when it became probable that the 1.66-acre strip would be included in the Indian Avenue northern alignment project, but the trial court did not make any finding on this issue because it believed the project effect rule did not apply at all.

Accordingly, we remand to the trial court to determine whether inclusion of the property at issue in the project for which the property was ultimately condemned was probable in 2005, when the designation of the property first appeared in the circulation element as part of the northern alignment of Indian Avenue and a dedication requirement was put in place.  The trial court is also directed to reconsider whether the required dedication of the 1.66-acre strip passes muster under *Nollan* and *Dolan* in light of the errors in its inquiry identified by the Court of Appeal, which the City does not contest.  The trial court in its sound discretion may begin with either the project effect inquiry or the *Nollan*/*Dolan* inquiry, and then engage the second inquiry only if the first does not resolve the case.  If the court does undertake the *Nollan*/*Dolan* inquiry, it must determine whether the City has shown that the dedication at issue, a strip comprising almost 20 percent of the property running through its middle, would have an essential nexus to a valid public purpose that would be served by denying the permit and would be roughly proportional to the impact of any future development.

## CONCLUSION

We hold, contrary to the Court of Appeal below, that the constitutionality of a dedication requirement under *Nollan* and *Dolan* is a question for a court, not a jury. We further hold that the project effect rule generally applies, and the *Porterville* doctrine does not apply, when it is probable at the time a dedication requirement is put in place that the property subject to the dedication will be included in the project for which the condemnation is sought. We remand this case to the Court of Appeal with instructions to remand to the trial court for proceedings not inconsistent with this opinion.

LIU, J.

WE CONCUR:

CANTIL-SAKAUYE, C. J.
WERDEGAR, J.
CHIN, J.
CORRIGAN, J.
KRUGER, J.

31

**CONCURRING AND DISSENTING OPINION BY CUÉLLAR, J.**

Neither the federal nor the state Constitution bars the government from taking private property to further a legitimate public purpose, so long as the property owner receives just compensation. (U.S. Const., 5th Amend.; Cal. Const., art. I, § 19, subd. (a).) At issue in this case are the rules for calculating precisely what compensation is just.

Under California law, the proper measure of compensation when the government takes private property "is the fair market value of the property taken." (Code Civ. Proc., § 1263.310.) The fair market value, in turn, reflects the price that an informed but disinterested buyer would negotiate with a similarly positioned seller on the date of valuation, each with full knowledge of the property's highest and best use. (*Id.*, § 1263.320, subd. (a); see *City of San Diego v. Neumann* (1993) 6 Cal.4th 738, 744.) The knowledge imputed to the parties in this hypothetical negotiation consists of " '*all* the facts which would naturally affect [the property's] value' " and " 'which enter into the value of the land in the public and general estimation, and tend[] to influence the minds of sellers and buyers.' " (*Merced Irrigation Dist. v. Woolstenhulme* (1971) 4 Cal.3d 478, 493 (*Woolstenhulme*), italics added.) Crucially, this knowledge would encompass, as the majority readily acknowledges, " 'lawful legislative and administrative restrictions on property, which a buyer would take into consideration in arriving at the fair market value.' " (Maj. opn., *ante*, at p. 20, quoting *People ex rel. State*

*Public Works Bd. v. Talleur* (1978) 79 Cal.App.3d 690, 695-696.)  The jury — which, unless waived, is charged with determining the amount of compensation (Cal. Const., art. I, § 19) — may consider this information, along with all the other relevant facts governing permissible uses of the property.  Allowing the jury to weigh such information helps ensure that the compensation awarded is "just to the public as well as to the landowner."  (*Los Angeles County Metropolitan Transportation Authority v. Continental Development Corp.* (1997) 16 Cal.4th 694, 716.)

The likelihood that some portion of the property could never be developed is one fact that would indisputably bear on permissible uses of any undeveloped property.  For example, where a public agency lawfully demands that a landowner dedicate a portion of the property to the public as a legitimate condition for granting a permit to develop the remainder of the parcel, no compensation is due. (Maj. opn., *ante*, at p. 21; see *Dolan v. City of Tigard* (1994) 512 U.S. 374, 391; *Nollan v. California Coastal Commission* (1987) 483 U.S. 825, 836 (*Nollan*).) The Fifth Amendment does not shield a landowner from responsibility to mitigate the burdens imposed on the public by a parcel's development, and the mitigation undertaken by the public entity — e.g., roads, drainage, habitat preservation — often redounds to the benefit of the landowner as well as to the public generally. So long as there is an "essential nexus" (*Nollan*, at p. 837) and " 'rough proportionality' " (*Dolan*, at p. 391) between the required dedication and the projected impact of the development, the dedication results from a valid exercise of the public entity's police power, not from a taking.  (*Nollan*, at p. 836.)

In some situations, a landowner will not yet have sought to develop the property, but there is a reasonable probability that a public agency would lawfully condition any future development on a dedication of land to offset the development's effects.  This probable future dedication is likewise a fact that

2

would bear on the property's permissible uses. Under California case law, the fair market value of the dedicated land is therefore based on its undeveloped, agricultural state. (Maj. opn., *ante*, at pp. 20-21; *City of Porterville v. Young* (1987) 195 Cal.App.3d 1260, 1265-1269 (*Porterville*).) This is so, as the majority explains, because the landowner would never have been able to develop the dedicated portion of the property. (Maj. opn., *ante*, at p. 21.) "[I]f the remainder of the parcel *is not* developed beyond its present agricultural use, [the] owner will have been paid exactly what the take was worth; if the remainder of the parcel *is* developed for commercial purposes, [the] owner will have been paid for the land he would have been required to dedicate to [the] city to obtain the building permits or conditional use permit necessary for the commercial development." (*Porterville*, at p. 1269.)

Here, a public agency asserts that the strip of land sought for condemnation is the *same* strip it would have required the property owner to dedicate as a condition of development. The property's valuation as undeveloped, agricultural land thus depends on (1) whether the hypothetical dedication could lawfully have been imposed, and (2) whether it was reasonably probable the agency would actually have imposed the dedication as a condition of development, even in the absence of the project. (*Porterville*, *supra*, 195 Cal.App.3d at pp. 1268-1269 [record showed that the dedication would have been required as a condition of development even if the city had not undertaken its street-widening project]; *City of Fresno v. Cloud* (1972) 26 Cal.App.3d 113, 119 [trial court erred in excluding evidence of a "high probability" that building permits would not have been issued without the street dedications].) Where those two elements are satisfied, "the most that a willing buyer would pay for the portion subject to the dedication

3

requirement is its value in its undeveloped state." (Maj. opn., *ante*, at p. 21.)[1]  If, on the other hand, "the owner were compensated based on the highest and best use of the property [as light industrial], the owner would get a windfall — i.e., payment based on developed value for property that could not have been developed under any circumstances." (Maj. opn., *ante*, at p. 21; see *Contra Costa Flood Control etc. Dist. v. Lone Tree Investments* (1992) 7 Cal.App.4th 930, 935-936 ["Lone Tree would receive a windfall if it were to receive commercial value for a strip of land that would never be developed and that a buyer knew could not be developed"].)

Such a payment would not only be a windfall.  It would be unconstitutional. (See *Redevelopment Agency v. Gilmore* (1985) 38 Cal.3d 790, 809 (conc. opn. of Mosk, J.).)  A compensation award that would make the owner better off than if the property were never taken is flatly contrary to the constitutional requirement that just compensation be "just to the public as well as to the landowner." (*Los Angeles County Metropolitan Transportation Authority v. Continental Development Corp.*, *supra*, 16 Cal.4th at p. 716; accord, *United States v. Commodities Corp.* (1950) 339 U.S. 121, 123.)

I therefore part company with the majority to the extent it mandates such a windfall when (in its words) "it was probable at the time the dedication requirement was put in place that the property designated for public use was to be included in the project for which the property is being condemned." (Maj. opn.,

---

[1]  Some jurisdictions go so far as to deny compensation altogether for the dedicated land, even when the owner has not yet sought to develop the property. (See *State v. Sturmfels Farm Ltd. Partnership* (Mo.Ct.App. 1990) 795 S.W.2d 581, 587 [where the dedication requirement would have been constitutional and was reasonably likely to have been imposed, landowners suffer "no compensable loss"].)

*ante*, at p. 3.)  The extra layer of analysis it purports to add to the *Porterville* inquiry is as difficult to understand as it is to apply.  Nor can the majority point to a single authority, in this state or any other jurisdiction, that has applied a "date of probable inclusion" analysis to exclude an entirely lawful, reasonably probable dedication from the determination of just compensation.  This omission is particularly striking, given that "every court across the United States that has decided the issue has held that future dedication requirements *are* admissible" in determining just compensation for the dedicated land.  (Herman & Martinez-Esteve, *The Admissibility of Dedication Requirements in Condemnation Cases: No Longer the Road Less Traveled* (Nov. 2011) 85 Fla. Bar J. 20, 22, italics added.)  Most importantly, the majority fails to explain how the windfall it has now required public agencies to pay to random, lucky property owners can be reconciled with the state Constitution.

What the majority appears to believe is that the project effect rule compels it to exclude evidence of a hypothetical dedication from the valuation of property lawfully subject to a dedication requirement.  This rule provides that "[t]he fair market value of the property taken shall not include any increase or decrease in the value of the property that is attributable to . . . [¶] (a) The project for which the property is taken" or "(c) Any preliminary actions of the plaintiff relating to the taking of the property."  (Code Civ. Proc., § 1263.330.)  But section 1263.330 is merely a codification of just compensation principles.  (See *Woolstenhulme*, *supra*, 4 Cal.3d at pp. 496-497; *Buena Park School District of Orange County v. Metrim Corp.* (1959) 176 Cal.App.2d 255.)  Where, for example, property was initially expected to be attractively close to an artificial lake but was eventually condemned to build the lake, evidence of the project's effect on the property's value is inadmissible from the point at which it became reasonably probable that the property would in fact be taken for the project.  (*Woolstenhulme*, at p. 484.)

5

And where property is condemned for a freeway, the valuation of the property should exclude a zoning restriction barring any development on the property that would be inconsistent with the proposed freeway. (*City of San Diego v. Rancho Penasquitos Partnership* (2003) 105 Cal.App.4th 1013, 1034, 1038-1039.)

This case is different. The project effect rule has no application where the agency can show that the dedication on which it relies was lawful and would actually have been imposed, independent of the project. When the agency makes this showing, it has done all it needs to prove that any decrease in the value of the property is "attributable to" the exercise of its lawful police power to compel a dedication — and is therefore *not* "attributable to" the project for which the property is being condemned or any preliminary actions relating to the taking of the property. (Code Civ. Proc., § 1263.330.) In other words, where the agency could have (and would have) required that the property be dedicated to mitigate the effects of any development, the agency has shown that the dedicated land could never have been developed, even if the agency had not undertaken the project in which it is currently engaged. Nothing in the language or legislative history of the project effect statute indicates an intent to exclude evidence of lawful dedications that mitigate the effects of developing a property and that would have been imposed as a condition of development, independent of any project then being undertaken.

Nor does our case law support the majority's approach. In *State Route 4 Bypass Authority v. Superior Court* (2007) 153 Cal.App.4th 1546, for example, the joint powers agency formed to facilitate the construction of a new highway instructed its member agencies to condition the grant of any development applications on the dedication of a 110-foot right-of-way " 'lying about the centerline of the SR4 Bypass.' " (*Id*. at p. 1551.) A city engineer testified that this dedication requirement was designed to facilitate the project and that, in applying

6

the dedication requirement, he "would not typically take into account any traffic study done in connection with a [particular] development or the nature of the development proposed." (*Id.* at p. 1553.) Although there is certainly room to question whether the Court of Appeal correctly determined that the dedication was lawful or reasonably probable in that case, it nonetheless seems plain that the dedication requirement there was put in place *after* inclusion of the affected properties became probable. (Accord, *Dept. of Trans. v. Lundberg* (Or. 1992) 825 P.2d 641, 648 [upholding the admission of evidence concerning the city's dedication requirement on the issue of valuation, even though the dedication was adopted after the city and state had decided on a plan to widen the avenue that served as a state highway, and the dedication was enacted to "implement" the project].)

What the majority also fails to recognize is that its asserted policy justifications for cutting back on *Porterville*, *supra*, 195 Cal.App.3d 1260, have already been addressed — in *Porterville* itself. To resolve whether it is "reasonably probable" that a public agency would actually have imposed the dedication as a condition of development even in the absence of the project, the trier of fact may indeed consider whether the dedication requirement is a "standard" one that has been "imposed on multiple, similarly situated properties." (Maj. opn., *ante*, at p. 28.) The factfinder may also consider whether there has been only "a short period between the time the property is designated for public use and the time the agency first signals its intention to condemn the property" (*id.* at p. 29), to the extent the closeness in time casts doubt on the likelihood the public agency would actually have imposed the dedication as a condition of development. How much weight to accord these facts is properly reserved to the trier of fact.

7

Instead, the majority's approach is likely to generate mischievous effects — and not only for the trier of fact. The majority's reliance on the concept of an agency's "original expectation," or what a public agency "originally contemplated" (maj. opn., *ante*, at p. 26) represents a substantial retreat from the well-settled rule that "[t]he proper inquiry is not into the subjective motive of the agency" — an inquiry that would violate "the principle that courts do not delve into the individual purposes of decisionmakers in a quasi-adjudicative proceeding" — but (rather) whether the agency's findings are based on substantial evidence. (*Landgate, Inc. v. California Coastal Com.* (1998) 17 Cal.4th 1006, 1022; see maj. opn., *ante*, at pp. 11-12, quoting *Landgate*.) Courts avoid such investigation into the subjective mental states of public decisionmakers for good reason. Because public agencies rarely if ever operate entirely as unitary actors, it is far from obvious what it means to divine their "intent" in this context. The majority's approach may also encourage or even force public agencies to postpone planning related to a project until a dedication requirement has already been established, which would unduly and unnecessarily hamper the planning process. (See *Klopping v. Whittier* (1972) 8 Cal.3d 39, 45, fn. 1.) Indeed, to say that a public agency can exact a lawful and reasonably probable dedication valued as undeveloped land *only* when the ultimate use of the dedicated property is unknown or unforeseeable all but encourages agencies to engage in willful blindness, by pitting good planning against a fair price for the property.

Finally, the majority leaves unanswered a panoply of questions about how its new rule is supposed to be applied and what effects it will have. For example:

A public project typically has multiple justifications, and a dedication may be sought to offset myriad effects from development. Must the dedication be excluded from valuation, even though it was lawful and would have been imposed as a condition of development, when the agency is unable to show that the

8

dedication was "contingent on" development of adjacent property (maj. opn., *ante*, at p. 26) or is otherwise unable to exclude the possibility that the dedication might also serve valid public purposes unrelated to development of the property?

The majority puts determinative weight on the date the dedication requirement was put in place. Does the majority's approach effectively nullify ad hoc dedication requirements?

Will identical dedications on identical types of property trigger different levels of compensation, depending on what the agency originally contemplated or how far along the project is? When a dedication is lawfully made a condition of development, but the property is probably included in a project, must the property owners who have submitted applications to develop their property be paid for the dedication — a dedication the government would otherwise have obtained "for free" (maj. opn., *ante*, at p. 21)? And how should buyers and sellers in the market value a potential dedication when the value of that dedication will be determined entirely on the relative timing of the imposition of a dedication requirement and the commencement of the project for which the dedication is sought?

These questions are crucial under our law, but they are not ones the project effect rule is capable of answering. The project effect rule, as interpreted in our case law, ensures only that the condemned property's valuation is not distorted by a public agency's preparations for the project, or by the project itself. But where a strip of the property in question would lawfully have been taken to offset the impact of developing the rest of the parcel — even if the project never existed — then the probable future dedication is neither a "project" nor preliminary actions "relating" to the project within the meaning of section 1263.330 of the Code of Civil Procedure. That the majority fully agrees with this proposition (see maj. opn., *ante*, at p. 26 ["Nothing in the language or legislative history of subdivision (a) indicates an intent to cover steps taken by a public agency to mitigate the

9

impact of development, independent of any project"]) makes its apparent retrenchment from *Porterville* all the more difficult to understand.

Under the approach I endorse, by contrast, the task for the trial court on remand would remain straightforward — sensitive to the realities of the planning process, and in accordance with established law. Quite simply: Does the dedication satisfy *Porterville*? To answer that question, the trial court would consider whether requiring the owners to dedicate a middle strip comprising almost 20 percent of their property would have an essential nexus to the valid public purpose that would be served by denying the permit, and whether the dedication would be roughly proportional to the impact of any future development. (See *Rohn v. City of Visalia* (1989) 214 Cal.App.3d 1463 [a dedication constituting 14 percent of the property, which would be used to realign a city street, was an improper condition under *Nollan*, *supra*, 483 U.S. 825, on the owner's application to convert a residence to an office building].) If so, a jury would determine whether it was reasonably probable the city, even in the absence of the project, would have required a dedication of this scope. If the city fails to satisfy either element of *Porterville*, then the city's condemnation of the strip can fairly be characterized as part of the Indian Avenue project, and the purported dedication requirement, under the project effect rule, should be excluded from the jury's valuation of the property.

So I concur with the majority that the first prong of the *Porterville* inquiry is a question for a court, not a jury. But otherwise, I respectfully dissent.

**CUÉLLAR, J.**

10

# APPENDIX



SCALE 1"=100'

PERRY STREET

P.O.C.

APN 302-060-002

GROSS:
397,188 SQ. FT.
9.11 ACRES
NET:
324,714 SQ. FT.
7.45 ACRES

STAMPER TRUST & ROBINSON

PROPOSED INDIAN AVE.

BARRET AVENUE

AREA
72,474 SQ. FT.
1.66 ACRES

P.O.B.

KCT CONSULTANTS, INC.
Civil Engineers - Surveyors - Planners

RIDGE INDIAN AVENUE
EXHIBIT "B" - PARCEL 1
RIGHT-OF-WAY ACQUISITION

FOR: RIDGE PROPERTY TRUST

W.O. F.B. FILE NO. 1386-03

1
OF 1 SHEETS

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** City of Perris v. Stamper
_____

**Unpublished Opinion**
**Original Appeal**
**Original Proceeding**
**Review Granted** XXX 218 Cal.App.4th 1104
**Rehearing Granted**

_____

**Opinion No.** S213468
**Date Filed:** August 15, 2016
_____

**Court:** Superior
**County:** Riverside
**Judge:** Dallas Holmes*

_____

**Counsel:**

Allen Matkins Leck Gamble Mallory & Natsis, K. Erik Friess and Nisha Verma for Defendants and Appellants.

Luke A. Wake; Paul J. Beard II, Jennifer F. Thompson and Jonathan W. Williams for Pacific Legal Foundation and NFIB Small Business Legal Center as Amici Curiae on behalf of Defendants and Appellants.

Aleshire & Wynder, Eric L. Dunn, Sanaz K. "Sunny" Soltani, Pam K. Lee and Adriana P. Mendoza for Plaintiff and Respondent.

Shute, Mihaly & Weinberger, Andrew W. Schwartz, Maya Kuttan and Laura D. Beaton for League of California Cities and California State Association of Counties as Amici Curiae on behalf of Plaintiff and Respondent.

*Retired judge of the Riverside Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

K. Erik Friess
Allen Matkins Leck Gamble Mallory & Natsis
1900 Main Street, Fifth Floor
Irvine, CA  92614-7321
(949) 553-1313

Sanaz K.“Sunny” Soltani
Aleshire & Wynder
18881 Von Karman Avenue, Suite 1700
Irvine, CA  92612
(949) 223-1170