Filed 8/26/21

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| CITY OF ESCONDIDO, | D077549 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. 37-2016-00010237-CU-EI-NC) |
| PACIFIC HARMONY GROVE DEVELOPMENT, LLC, et al., | |
| Defendants and Appellants. | |

APPEAL from a judgment of the Superior Court of San Diego County, Jacqueline M. Stern, Judge. Affirmed.

Blanchard Krasner & French, Steven M Silva, John F. Whittemore; Morrison & Foerster, Benjamin J. Fox, Matthew E. Ladew, Mark C. Zebrowski and James R. Sigel for Defendants and Appellants.

Dean Gazzo Roistacher, Lee H. Roistacher, Scott Noya; Daley & Heft, and Dennis W. Daley for Plaintiff and Respondent.

Pacific Harmony Grove Development, LLC and Mission Valley Corporate Center, Ltd. (Owners) appeal the judgment entered in a condemnation case following the first phase of a bifurcated trial at which the trial court resolved certain legal issues concerning how to value the condemned property.

The City of Escondido (City) sought to acquire by condemnation from Owners a 72-foot-wide strip of land (the strip) across a mostly undeveloped 17.72-acre parcel (the Property) to join two disconnected segments of Citracado Parkway, a major road that runs through portions of the City's industrial areas on either side of the Property.[1] The City argued below that the strip should be valued under the *Porterville* doctrine (*City of Porterville v. Young* (1987) 195 Cal.App.3d 1260 (*Porterville*)), which values condemned property at its undeveloped state (here, about $50,000) when the condemning agency can establish that (1) it would have conditioned development of the remainder of the property on dedication of the condemned portion, and (2) such a dedication requirement would be constitutional under *Nollan v. California Coastal Commission* (1987) 483 U.S. 825 (*Nollan*) and *Dolan v. City of Tigard* (1994) 512 U.S. 374 (*Dolan*), which require that a dedication requirement have an essential nexus and be roughly proportional to the public interest that would be served by denying development approval.

Owners argued the *Porterville* doctrine did not apply, and that the court should instead apply the "project effect rule," which disregards for valuation purposes a condemner's belated imposition of a dedication requirement as a means to drive down the price of property the condemner is likely to condemn. (See *City of Perris v. Stamper* (2016) 1 Cal.5th 576, 585 (*Stamper*); Code Civ. Proc.,[2] § 1263.330.) Owners maintained the City violated this rule by imposing dedication requirements on the Property long

---

[1]    We have appended to this opinion trial exhibits depicting the Property and surrounding area.  In exhibit 343, the Property is outlined in blue.  In exhibit 321.17, the Property is shaded.

[2]    Further undesignated statutory references are to the Code of Civil Procedure.

2

after it became probable that the City would condemn the strip to complete the Citracado Parkway extension project. Thus, Owners maintained the strip should be valued based on its highest and best use, without regard for the dedication requirement (about $960,176).

Owners also argued they were entitled to precondemnation damages caused by the City's unreasonable delay in pursuing condemnation proceedings and other unreasonable conduct. The City countered that it did not engage in unreasonable delay or conduct because it commenced condemnation proceedings shortly after it annexed the Property from county jurisdiction in 2015.

After a four-day bench trial, the court issued a comprehensive statement of decision ruling in the City's favor on all issues. The parties then stipulated to a judgment, which the court entered.

Owners appeal, contending the trial court erred by finding the *Porterville* doctrine applied, the project effect rule did not, and the City was not liable for precondemnation damages. For reasons we will explain, we find the City's positions more persuasive, and affirm the judgment.

## PROCEDURAL AND FACTUAL BACKGROUND

### *Pretrial Procedure*

On March 23, 2016, the City adopted a resolution of necessity declaring its intent to condemn the strip (and other portions of the Property not at issue here).

Two days later, on March 25, the City filed an eminent domain complaint against Owners. The City deposited funds with the state treasurer and took immediate possession of the strip.

By stipulation, the trial court bifurcated the trial so it could determine in the first phase whether the *Porterville* doctrine or project effect rule

3

applied, and whether the City was liable for precondemnation damages. In the second phase, if needed, a jury would determine the amount of compensation and precondemnation damages the City owed Owners.

### *Trial – Phase One*

#### <u>Overview</u>

The trial court heard the first phase of trial over four days in December 2018.

To support its position that the *Porterville* doctrine applied, the City presented evidence showing (1) the City would have required Owners to dedicate the strip in exchange for approval to develop the Property because (a) the city enacted an ordinance in 1993 generally requiring such dedications, (b) the City's long-term planning documents contemplated since 2002 that Citracado Parkway would eventually connect across the Property via the strip, and (c) the City had required other landowners in the area to make similar dedications to mitigate the impacts of industrial development; and (2) the dedication requirement would have been constitutional because it (a) had an essential nexus to mitigating traffic impacts caused by development of the Property, and (b) was roughly proportional to the extent of those development impacts as established by traffic studies and other analyses.

To support their position that the project effect rule applied instead, Owners maintained (1) it became probable that the City would condemn the strip in 2006 because the City entered into a development agreement that year with a hospital district and obligated itself to connect the Citracado Parkway segments; and (2) the City's dedication requirement did not arise until later, when the City amended its general plan in 2012 to restrict access

4

to the Property from another road, thus requiring that primary access be taken from the Citracado Parkway extension.

Similarly, to support their claim for precondemnation damages, Owners maintained the 2006 agreement with the hospital district constituted the City's formal announcement of its intent to condemn the strip, which the City did not fulfill until 10 years later.

### The City's Case

#### Witnesses

The City called two witnesses, both of whom were designated as percipient and expert witnesses.

Julie Procopio is the City's Director of Engineering Services and City Engineer. Her duties include reviewing development proposals to ensure they comply with City codes and standards, and to "evaluate the . . . burdens associated with [a proposed] development and to weigh in on how those . . . are mitigated to insure adequate infrastructure is provided." This includes assessing impacts on traffic, fire and life safety, utilities, drainage, and water quality.

John Martin is the City's Director of Community Development. His duties include implementing the City's planning documents, reviewing project submittals, and conducting environmental reviews.

#### Development and Regulatory History

Before 2015, the Property was within County of San Diego (County) jurisdiction, not City jurisdiction. Thus, the City could not approve its development or impose development conditions on it.

Nevertheless, as early as 1988, the circulation element of the City's general plan showed Citracado Parkway running through portions of the Property from north to south (though not in its currently proposed

alignment).  Procopio testified that a general plan is a long-range development plan that the state requires each city and county to maintain.  All developments within a jurisdiction must either conform to the general plan, or amend it to allow the proposed development.  A circulation element is the component of a general plan that shows existing and proposed street networks "intended to support the long-term orderly development of a city."

In 1993, the City adopted an ordinance setting forth general dedication requirements for property developers.  The ordinance provided that "[a]ny applicant who constructs any new building . . . shall also construct public improvements across all unimproved or underimproved frontage and shall grant necessary public dedication."  The ordinance defined "public dedication" as "the dedication . . . of all easements and rights of way by the applicant to the city, in conformance with the circulation element of the general plan . . . ."  The City amended portions of this ordinance several times, but none of those amendments substantively altered these public dedication requirements.

Procopio testified that when a developer seeks City approval of a project, the City reviews the proposal for completeness and compliance with City land use requirements.  This includes enforcing the 1993 ordinance by ensuring the proposed development dedicates and constructs sufficient infrastructure to support the development and mitigate its impacts "in conformance with the general plan."  Procopio testified that under the California Environmental Quality Act (CEQA), "a project would have to show that it can mitigate its impacts or . . . the city would be compelled to deny that project."

Martin similarly testified that the City would ensure that "any development proposal . . . was in conformance with [the] general plan before [the City] would allow approval."

6

In the early 2000's, Owners purchased the property directly east of the Property (Pacific Oaks Place).  In exchange for City approval to subdivide this property into nine lots, Owners expanded Harmony Grove Road on the property's northern frontage, and dedicated and built a new interior industrial classification road within the property.

In 2002, the City approved development of "a high quality industrial/business park," commonly known as the Escondido Research and Technology Corridor (ERTC), north of the Property.  The City thus amended its general plan and circulation element to reflect Citracado Parkway running through the ERTC and eventually extending southward across the Property in its currently proposed alignment.  In exchange for development approvals from the City, another developer in the ERTC area dedicated portions of its properties and built portions of the northern segment of Citracado Parkway.

In 2006, the City entered into a development agreement with Palomar-Pomerado Hospital District (PPH) allowing PPH to construct a new hospital at the northern end of the ERTC.  In one section of the agreement (§ 1.4.2), the City agreed that it "shall complete, with the substantial financial support of PPH, and subject to compliance with [CEQA], the construction and improvement of Citracado Parkway . . . ."  In another section (§ 5.6.2), the City agreed that it "shall complete the Citracado Parkway" extension within 10 years of obtaining necessary funding (then estimated at $19 million) from specified sources.  One of those sources was "Third-Source Funding," which included "reimbursement from other developers who stand to benefit from the completion of the Citracado Parkway" extension.  PPH agreed to contribute $13 million toward offsite traffic improvements.

7

Also in 2006, the City began working on an environmental impact report (EIR) for the Citracado Parkway extension project.

In 2007, Owners purchased the Property, which was still within County jurisdiction. Procopio testified that the County's "circulation element show[ed] the same alignment" as the City's for Citracado Parkway across the Property. The Property was zoned for low-density residential use, and was improved with one small house served by a dirt driveway. Owners' general partner, Richard Dentt, an experienced real estate developer, acknowledged on cross-examination he conducted due diligence and was "aware before [Owners] purchased the Property that the [City's] circulation element of the general plan . . . showed Citracado Parkway going through the [Property]."

In 2009, in anticipation of the City annexing the Property into its jurisdiction, Owners submitted a tentative map to the City proposing to subdivide the Property into 10 lots for use as a business park (similar to what they had done next door at Pacific Oaks Place). Owners' proposed tentative map showed them dedicating the strip to the City to extend Citracado Parkway across the Property. Owners ultimately abandoned this proposal.

In 2012, the City certified the EIR for the Citracado Parkway extension project. The related traffic study anticipated the extension project would generate approximately 19,400 new average daily trips.

Also in 2012, the City amended its general plan to specify that all non-residential properties in the southern portion of the ERTC planning area (where the Property is located) take their primary access from Citracado Parkway. Although this plan generally still allowed these properties to take secondary access from Harmony Grove Road, it prohibited such access for non-residential properties west of the proposed Citracado Parkway extension (including the portion of the Property west of the strip). Procopio testified

8

this amendment was necessitated by "feedback from the County that [such access] needed to be prohibited," and "because things happened" between 1990 and 2012 "that made that language necessary."[3]  Procopio estimated this 2012 amendment affected about 10 properties in the ERTC planning area.

In 2015, the City annexed the Property and several neighboring parcels into City jurisdiction.  As part of the annexation, the Property was "up zoned" for industrial use.  Procopio testified it was the fact the circulation element provided for the Citracado Parkway extension through the Property that made annexation and up zoning desirable and possible.  Procopio testified the City would have proceeded with the Citracado Parkway extension project even without the annexation because of the project's overall benefit to the region.

In 2016, when Owners still had not developed the Property, the City commenced this action to condemn the strip.  Martin testified he had not initially anticipated having to resort to condemnation because Owners' 2009 tentative map proposed dedicating the strip to the City.

*Rough Proportionality Analysis*

To establish under the *Porterville* doctrine that the City could constitutionally have required that Owners dedicate the strip as a condition of developing the Property, Procopio testified at length about the *Nollan/Dolan* rough proportionality analysis she performed to compare the burden to Owners of the dedication requirement against the impacts caused by their hypothetical development of the Property.  She described several methods she used for comparison.

---

3    Procopio did not elaborate on the "feedback from the County" or the "things" that "happened" between 1990 and 2012.

9

First, Procopio examined the impact that developing the Property would have on the extension project. Using a SANDAG table of traffic-generation estimates for developments in the San Diego region, Procopio determined that developing the Property for a typical industrial use would generate about 3,500 average daily trips.[4] This constituted about 18 percent of the 19,400 new daily trips the Citracado Parkway extension project was expected to generate. Applying that 18 percent to the total project cost of about $34 million dollars, Procopio concluded that industrial development of the Property would result in a burden to the City of about $6 million. Procopio opined this was "the low end of what you would expect based on the anticipated uses," which also included medical offices that were expected to generate 8,500 new daily trips.

Second, Procopio compared "the proportional length" of the extension project on the Property (about 950 feet) with the total length of the extension project (about 5,350 feet between the two existing segments of Citracado Parkway). This also amounted to about an 18 percent, or $6 million, burden to the City.

Third, because the Property is zoned for industrial use, Procopio determined how much it would cost Owners to build the 72-foot-wide industrial classification road the City would require as a condition of allowing *any* industrial development of the Property.[5] She calculated the cost using two methods.

---

[4]    Procopio testified she "looked at the potential list of land uses and evaluated what . . . roadway improvements or classification would be needed in order to serve those land uses."

[5]    Procopio explained that, regardless of traffic volume, the City requires that certain classifications of roads have certain widths so they can

In one method, Procopio took the City's $5.9 million cost of constructing the 92-foot-wide extension project from the existing northern segment of Citracado Parkway to the southern boundary of the Property, and prorated it to 78 percent, or $4.6 million, to reflect the fact the City would require Owners to construct only a 72-foot-wide industrial road (72 feet is about 78 percent of 92 feet).

In the other method, Procopio looked only at what it would cost Owners to build a 72-foot-wide industrial road entirely within the Property boundaries (i.e., not connecting to either existing segment of Citracado Parkway). She opined this would cost about $2.38 million, which would represent the "fair share" the City would ask a developer to contribute toward construction of the extension project across the Property.

Procopio described how the City's construction of the extension project would benefit the Property, including by: providing environmental, biological, and cultural mitigation for which Owners would otherwise be responsible when developing the Property; relocating water lines from an easement on the Property into the extension project's right-of-way, thereby "giv[ing] [Owners] more developable land"; connecting water lines and building fire hydrants; and providing better visibility and connectivity to the transportation network. More generally, the City was prepared to build at its own expense a road that it would otherwise require a developer to build as a condition of developing its land.

Procopio testified there were several reasons why the Property could not take its access from its existing northern frontage along Harmony Grove Road. First, the "narrow two-lane road" was already too congested under the

accommodate underground utilities, surface drainage, pedestrians, and delivery truck and firetruck access.

11

City's rating system. Although Harmony Grove Road was currently meeting the City's general plan policy goal of operating at level C (relatively free-flowing), the City projected that—apart from any development of the Property—other approved and pending projects in the area would cause the road to operate in the near-term at level E ("substantial congestion"), and in the long-term at level F ("essentially gridlock"). By contrast, the Citracado Parkway extension was anticipated to operate "[j]ust under [level] B." Moreover, Procopio opined it would be more efficient and less costly for Owners to provide access to the Property via the Citracado Parkway extension than to acquire the extensive additional land necessary to provide industrial road access via some alternate route.

Second, Procopio testified the Property's "frontage is so minimal on Harmony Grove Road" that it would not be "feasible to build an industrial project" on the portion west of where the strip dissects it. And although the portion east of the strip might have sufficient frontage, "that site would be challenged by only having one access point."

Third, Procopio explained that the City's 2012 general plan provided that Harmony Grove Road could provide only secondary access to the Property; primary access had to come from the Citracado Parkway extension.

Procopio distinguished the Property from another development on Harmony Grove Road that Owners claimed was comparable (the Exeter project). Whereas the Property was largely unimproved and the circulation element had long shown the Citracado Parkway extension running through it, "the Exeter project [was] in a completely different situation" because its site was already "largely improved" (because the previous owners had dedicated and improved the roadway along the site's frontage) and "the

12

circulation element . . . didn't show a . . . roadway down the center of the property."

Additionally, even though the Exeter project site had no frontage on the Citracado Parkway extension, the City determined the Exeter project's 212,000 square foot warehouse would contribute 256 new daily trips to the extension, for which the developer's fair share contribution toward constructing the extension was approximately $150,000 (about $590 per new daily trip).  Procopio explained that although the Property's fair share contribution rate would be higher because the Exeter site was already largely improved, even applying the Exeter project's lower $590 rate to the Property's projected 3,500 new daily trips on the extension would result in a fair-share contribution exceeding $2 million.

By any of Procopio's *Nollan/Dolan* metrics, the impacts of developing the Property exceeded the burden to Owners of dedicating the strip to mitigate them.

### *Owners' Case*

Owners' general partner, Richard Dentt, denied the extension would benefit the Property, and testified he "would have preferred to not have Citracado on there and have a parcel . . . with no road going through."

Dentt maintained Owners could develop the Property merely by widening Harmony Grove Road because the Property already had water and sewer service, and Owners had done the same thing for the neighboring Pacific Oaks Place project.  He acknowledged, however, that Owners also had to dedicate and build a 72-foot-wide interior industrial road there.

Dentt explained that Owners' 2009 tentative map proposal showed them dedicating the strip only "because it was by dictate of the City." Owners ultimately abandoned their 2009 proposal because the City "would

13

not allow [them] to process a development on the site without Citracado being built," and "the City didn't have the funding nor the plans nor the environmental approvals to build Citracado."

Dentt testified Owners received an unsolicited offer in 2012 to build a 12,000 square foot corporate headquarters and 140,000 square foot warehouse on the Property. He stated the deal fell through after he told the prospective tenant that the City was "still not to a point where [it] could guarantee the building of Citracado."

In 2016, before the City filed this action, Owners began negotiating with a brewery to lease the Property for warehouse, packaging, and delivery truck purposes. Dentt maintained such a development could take its access from Harmony Grove Road, and would not require "having an industrial classification road bisecting the property." Dentt testified that the brewery also preferred that the extension not cross through the Property. However, they ultimately (after this suit was filed) entered a lease "dependent on Citracado Parkway being built."

Dentt opined this type of "build-to-suit with a major corporation on a long-term lease was definitely the highest and best use" of the Property. However, another principal of Owners testified through his deposition that if the brewery deal went away, Owners "would just be doing whatever the market determined that they wanted, and it could have been medical office buildings or just about anything else."

Dentt estimated the strip's value, when put to its highest and best use, was about $960,176.

Although Dentt believed the Property could be developed in various ways that allowed access via Harmony Grove Road, he never addressed the City's evidence showing that the road was already too congested.

14

A civil engineer hired by Owners to develop a specific plan for the Property testified there was sufficient frontage along Harmony Grove Road to allow industrial development. He also believed it was feasible to widen Harmony Grove Road to an industrial classification road along the Property's frontage. However, the engineer did not address whether Harmony Grove Road had the capacity to handle additional traffic generated by development of the Property.

### *Statement of Decision*

In lieu of closing arguments, the court directed the parties to submit proposed statements of decision with citations to evidence and legal authorities. Based on the parties' submissions, the trial court issued a comprehensive 15-page statement of decision, ruling in the City's favor on all issues.

The court found the *Porterville* doctrine applied and, thus, the strip should be valued at its unimproved state. First, the court found it was reasonably probable the City would have required Owners to dedicate the strip to the City as a condition of developing the Property because the City's 1993 ordinance generally required such dedications, and Procopio testified the City routinely enforced this ordinance, including by requiring that other property owners in the ERTC area make similar dedications. Second, the court found the dedication requirement would be constitutional under *Nollan* and *Dolan* because it (1) had an essential nexus to the public purpose served by denying development (mitigation of traffic congestion caused by the development); and (2) was roughly proportional to the impact that development of the Property would cause, as "established by evidence of existing traffic levels and congestion on adjacent Harmony Grove Road, as

15

well as estimates of the increased amount of traffic that would result from commercial or industrial development of the property."

The court also found the project effect rule did not apply. Even assuming it was probable that the City intended to condemn the strip in 2006 when the City agreed with PPH to complete Citracado Parkway, the court found that the City's 1993 dedication ordinance and 2002 circulation element fixing the extension's location established that the City's dedication requirement predated the probable inclusion date by several years. Thus, the court found it "clear that the dedication was not put in place to drive down the value of the property but was a preexisting requirement to mitigate the traffic burdens created by development of the Property."

Finally, the trial court found Owners had not shown they were entitled to precondemnation damages. First, the court found the City did not unreasonably delay bringing the condemnation action because the City filed suit two days after adopting its resolution of necessity stating its intent to condemn the strip. Second, the court found the City's delay in commencing the extension project was not unreasonable because the Property was not even within the City's jurisdiction until 2015, Owners cited no authority establishing the City had a duty to act more quickly, and Owners had not pursued their 2009 proposal—or any other proposal—in the meantime. Lastly, the court found the City caused no diminution in value because Owners had not pursued any development opportunities between the 2015 annexation and the 2016 commencement of the condemnation suit.

### *Judgment*

After the court issued its statement of decision, the parties stipulated to entry of judgment awarding Owners $580,000 for all parcels identified in the City's complaint.

16

## DISCUSSION

## I.  The *Porterville* Doctrine Applies—The Project Effect Rule Does Not

Owners contend the trial court erred by finding the *Porterville* doctrine applies and the project effect rule does not.  We disagree.

### A.  **Legal Principles**

The measure of value in a condemnation case "is the fair market value of the property taken."  (§ 1263.310; see *Stamper*, *supra*, 1 Cal.5th at p. 598.)  The *Porterville* doctrine and project effect rule are alternative methods for determining fair market value when the condemned property is (or could become) subject to a dedication requirement.

### 1.  **The *Porterville* Doctrine**

The *Porterville* doctrine provides that "when a city would lawfully have conditioned development of property upon the owner's dedication of a portion of the property" to mitigate the impacts of the development, "the fair market value of that portion in a subsequent condemnation action is its value in its undeveloped, agricultural state," rather than in its highest and best developed state.  (*Stamper*, *supra*, 1 Cal.5th at p. 599; see *Porterville*, *supra*, 195 Cal.App.3d at pp. 1267-1269.)  The rationale for this rule is that because the owner could not develop the portion of land subject to dedication, no willing buyer would purchase that portion for more than its undeveloped value; thus, nor should the city pay more than that.  (*Stamper*, at p. 599.)

For the *Porterville* doctrine to apply, two criteria must be met.  First, the dedication requirement must be constitutional under *Nollan* and *Dolan*.  (*Stamper*, *supra*, 1 Cal.5th at p. 600.)  These cases hold that a dedication requirement "must have an 'essential nexus' to the valid public purpose that would be served by denying the development permit outright and must be ' "rough[ly] proportion[al]" ' to 'the impact of the proposed development' at

17

issue." (*Stamper*, at p. 585; see *Nollan*, *supra*, 483 U.S. at p. 837; *Dolan*, *supra*, 512 U.S. at pp. 390-391.) "No precise mathematical calculation is required, but the city must make some sort of individualized determination that the required dedication is related both in nature and extent to the impact of the proposed development." (*Dolan*, at p. 391; see *Stamper*, at pp. 591-592.)

Second, "it must be reasonably probable that the condemner would actually impose the dedication requirement as a condition of development." (*Stamper*, *supra*, 1 Cal.5th at p. 600.)

## 2.  The Project Effect Rule

The project effect rule prohibits the fair market value of condemned property from being influenced by the project for which the property is being condemned. (*Stamper*, 1 Cal.5th at p. 600; § 1263.330.)[6]  Thus, for example, "if the government is condemning property to build a reservoir, it need not pay lakefront prices for the property.  And if the government is condemning property to build a sewage plant, it does not get a discount because its project renders the property less desirable." (*Stamper*, at p. 601.)

Because a municipal zoning law has the potential to affect the value of property being condemned, it will fall within the project effect rule if it was "explicitly or implicitly enacted for the purpose of suppressing property values before an intended taking." (*Stamper*, *supra*, 1 Cal.5th at p. 602.)

---

6    The rule is codified in section 1263.330, which states:  "The fair market value of the property taken shall not include any increase or decrease in the value of the property that is attributable to any of the following:  [¶]  (a) The project for which the property is taken.  [¶]  (b) The eminent domain proceeding in which the property is taken.  [¶]  (c) Any preliminary actions of the plaintiff relating to the taking of the property."

18

When this occurs, the effect of the zoning law must be disregarded when valuing the condemned property. (*Ibid.*)

### 3. Interplay Between *Porterville* and the Project Effect Rule

There is an inherent tension between the *Porterville* doctrine and the project effect rule. The former allows a city's dedication requirements to depress the value of condemned property, while the latter prohibits it. The California Supreme Court resolved this tension in *Stamper, supra*, 1 Cal.5th 576.

The *Stamper* court held that "the date of probable inclusion" of the condemned property in a public project is the dividing line between when the *Porterville* doctrine and project effect rule apply. (*Stamper, supra*, 1 Cal.5th at pp. 602-604.) If the dedication requirement arose *before* the date of probable inclusion, the *Porterville* doctrine applies; if it arose *after*, the project effect rule applies. (*Id.* at p. 603.)

The date of probable inclusion is triggered by two requirements. First, the city must be "engaging in a 'project'—that is, a public work the government intended to pursue—for which it intended to acquire property by purchase or condemnation, if necessary, as opposed to a contingent plan to mitigate possible development on adjacent property through dedications." (*Stamper, supra*, 1 Cal.5th at p. 603.) Second, it must be "probable [that] the property at issue would be included in that project." (*Ibid.*)

Of particular relevance here, the *Stamper* court observed that when a city's general dedication ordinance and circulation element, in tandem, require that a strip of land be dedicated for a roadway if the larger parcel is ever developed, the "designation of the strip in the . . . circulation element [does] not, in itself, establish that it [is] probable [upon adoption of the circulation element] that the [c]ity would condemn that strip." (*Stamper*,

*supra*, 1 Cal.5th at pp. 603-604.)   This is because "when a public agency designates property for future public use in a planning document, it may well expect to acquire the property through dedications in response to future development rather than by purchase or condemnation."  (*Id.* at p. 604.)

In such an instance, the determination of whether "it is probable that the property will be included in the project" depends on factors such as (1) "the nature and circumstances of the dedication requirement" (*Stamper*, *supra*, 1 Cal.5th at p. 604); (2) "other evidence bearing on the reasonable expectations of the parties" (*ibid.*); (3) whether the dedication requirement is "a standard . . . requirement imposed on multiple, similarly situated properties" (*ibid.*); and (4) the length of time between when "the property is designated for public use and the time the agency first signals its intention to condemn the property" (*id.* at p. 605).

The date of probable inclusion "is for the trial court rather than the jury to determine."  (*Stamper*, *supra*, 1 Cal.5th at p. 605.)

## B.  **Analysis**

### 1.  **The *Porterville* Doctrine Applies**

### (a)  **The Dedication Requirement is Constitutional**

Whether a dedication requirement is constitutional under *Nollan* and *Dolan* is a "mixed question[ ] of law and fact in which the legal issues predominate."  (*Stamper*, *supra*, 1 Cal.5th at p. 586.)  "In reviewing a mixed question of law and fact, we defer to the express or implied factual findings of the trial court and determine the applicable legal principles de novo.  The standard which applies to the third step of the analysis, applying the law to the facts, depends upon whether factual or legal issues predominate. Where . . . the issue is predominately one of law, we review it de novo." (*Border Business Park, Inc. v. City of San Diego* (2006) 142 Cal.App.4th 1538,

20

1554; see *Ali v. City of Los Angeles* (1999) 77 Cal.App.4th 246, 250.) On our de novo review, we conclude the dedication requirement is constitutional under *Nollan* and *Dolan*.

The *Nollan* "essential nexus" test is easily satisfied here because requiring dedication of land for a roadway in exchange for development approval is logically related to the public interest in mitigating traffic impacts caused by that development. (See *Dolan*, *supra*, 512 U.S. at p. 395 ["Dedications for streets, sidewalks, and other public ways are generally reasonable exactions to avoid excessive congestion from a proposed property use."]; *Stamper*, *supra*, 1 Cal.5th at pp. 591-592.)

The dedication requirement also satisfies *Dolan*'s rough proportionality requirement. Procopio testified at length about the various calculations she performed to ensure that the burdens of the City's dedication requirement did not exceed the impacts caused by developing the Property.

Most notably, Procopio testified that because the Property was zoned for industrial use, the City would condition *any* development of the Property on dedication and construction of an industrial classification road. She estimated it would cost $2.38 million to build such a road entirely within the Property, and $4.6 million to build such a road that connected to the existing northern segment of Citracado Parkway. The City's construction of the extension project across the Property would spare Owners this expense, which the City would otherwise demand as Owners' fair share contribution. In contrast to this benefit, the dedication requirement would burden Owners either $50,000 (under the City's valuation) or $960,176 (under Owners' valuation). Even the most favorable comparison for Owners—a $2.38 million benefit versus a $960,176 burden—shows that the City's dedication requirement is not disproportionate.

21

Owners do not really take issue with these numbers. Instead, they argue that an industrial classification road across the Property is unnecessary because the Property already has sufficient frontage along Harmony Grove Road, which they could widen to industrial classification standards. But this ignores the City's evidence showing that Harmony Grove Road is already overburdened apart from any development of the Property. Approving further development along a road that is already expected to suffer from "substantial congestion" (level E) in the near term and "essentially gridlock" (level F) in the long term would violate the general plan's policy goal of providing service at level C. As Procopio and Martin both testified, the City requires that all development proposals conform to the general plan.

Procopio also testified that under SANDAG traffic-generation estimates, development of the Property for the range of uses allowed by its industrial zoning would likely result in 3,500 average daily trips, which represents about 18 percent of the Citracado Parkway extension's traffic volume, equating to about $6 million of the project's $34 million overall cost. And this was "the low end of what you would expect based on the anticipated uses" for the Property. Again, the burden on Owners under this measure is not disproportionate to the impacts of development.

Owners have several complaints about Procopio's traffic estimates. First, they assert she improperly based her estimates on Owners' 2009 proposal to subdivide the Property, which Owners maintain is a more intensive use than other alternatives. But Procopio explained she based her estimates on the whole range of uses permitted by the Property's industrial zoning, not just on Owners' 2009 proposal.

Second, Owners contend that although Procopio estimated traffic impacts for *some* hypothetical industrial developments of the Property, her analysis was deficient because she failed to consider *every conceivable* industrial development. For example, they assert she failed to consider that "multiple companies had approached [Owners] since 2009 with proposals to construct a single large building to house their corporate headquarters or a warehouse," which Owners imply would generate less traffic. We find this critique unpersuasive for several reasons.

First, the SANDAG data on which Procopio relied shows that requiring Owners to dedicate the strip would be roughly proportional to the traffic impacts of Owners' cited development alternatives. That is, the SANDAG chart shows that a corporate headquarters building would generate 1,870 new daily trips (110 trips per acre, multiplied by 17 acres), and a warehouse would generate about 1,020 new daily trips (60 trips per acre, multiplied by 17 acres). These totals represent about 10 percent and 5 percent, respectively, of the 19,400 new daily trips the $34 million extension project is expected to generate, yielding respective development impacts of about $3.4 million and $1.7 million—both of which exceed the $960,176 that Owners claim the strip is worth.[7] Thus, even assuming additional hypothetical uses are likely, these figures provide plenty of leeway to support a rough-proportionality finding.

Second, although Dentt testified that a lower-intensity use was the Property's highest and best use, another principal testified the highest and

_____

[7] Alternatively, applying the Exeter project's $590-per-trip cost—which Procopio explained is lower than the Property's per-trip cost would be—yields development impacts of $1.1 million for headquarters use, and $601,800 for warehouse use.

best use could include medical offices, which Procopio testified would generate 8,750 new daily trips on the extension, which amounts to about 45 percent of the extension's 19,400-trip capacity, equating to about $15 million in development impacts from the Property.

Wholly apart from traffic-generation estimates, Procopio also analyzed rough proportionality by comparing the proportional length of the overall extension project with the portion that crossed the Property. Under this method, Procopio again determined the Property would obtain about 18 percent of the benefit of the extension project, equating to about $6 million in development impacts. This outweighs the burden of requiring that Owners dedicate the strip.

All in all, we are satisfied the City did "its constitutionally required homework" (*Stamper*, *supra*, 1 Cal.5th at p. 596) to ensure that its dedication requirement was "more or less proportional" (*id.* at p. 592) to the impacts caused by developing the Property.

**(b)  It Is Reasonably Probable the City Would Require the Dedication**

We likewise conclude the second *Porterville* inquiry—that it was "reasonably probable that the condemner would actually impose the dedication requirement as a condition of development" (*Stamper*, *supra*, 1 Cal.5th at p. 600)—is satisfied.

Indeed, Owners concede in their appellate briefing that "development of [the Property] likely would have required some sort of dedication to mitigate any resulting adverse impacts." They question only whether the City would have "required [Owners] to give up the specific strip of land the City has now condemned." It is clear to us that the City would have.

Since 2002, the City's operative general plan and circulation element have shown the Citracado Parkway extension running through the strip.

Procopio explained that this is what made annexation of the Property feasible and desirable. Procopio (and Martin) also testified that the City reviews development proposals and ensures they comply with the circulation element. Consequently, other developers in the area dedicated land to extend Citracado Parkway in conformance with 2002 circulation element.

We are, thus, confident the City would actually condition development of the Property on Owners' dedication of the strip.

### C. **The Project Effect Rule Does Not Apply**

Owners contend the trial court erred by finding the project effect rule inapplicable because they maintain the City's dedication requirement arose after the date of probable inclusion (i.e., the date it became reasonably probable the City would acquire the strip by purchase or condemnation, rather than by dedication to mitigate development impacts (*Stamper*, *supra*, 1 Cal.5th at p. 603)).

Specifically, Owners maintain the date of probable inclusion was in 2006, when the City agreed in the PPH development agreement to complete Citracado Parkway. However, they insist the dedication requirement did not arise until 2012, when the City amended the general plan to restrict access to the Property from Harmony Grove Road. Assuming without deciding that 2006 is the date of probable inclusion,[8] we conclude the City's dedication requirement arose several years earlier.[9]

---

[8] There is good reason to reject 2006 as the date of probable inclusion. Although the City agreed in the PPH agreement that it would complete the Citracado Parkway extension, it agreed to do so within 10 year of obtaining the funding to do so, some of which it anticipated would come from other developers in the area who would benefit from the extension project. Other developers in the area did, in fact, dedicate land along the extension, and the Director of Community Development testified that as of 2009 he expected to

25

Like the trial court did, we too conclude the City's dedication requirement existed by 2002. The general dedication requirement arose in 1993 when the City enacted an ordinance requiring such dedications in exchange for development approvals. And the specific dedication requirement as to the strip arose in 2002, when the City's general plan and circulation element fixed the location of the Citracado Parkway extension across the Property.

Owners maintain the 2002 circulation element is insufficient to trigger the dedication requirement because the City could have amended it. (See *Stamper, supra,* 1 Cal.5th at p. 604 ["A circulation element is an anticipatory document, subject to amendment and updating."].) But the City has never done so. To the contrary, Procopio testified the City has been implementing the 2002 circulation element by requiring other developers in the area to dedicate land for the extension project in exchange for development approvals. Indeed, even Owners candidly admit that once the City adopted its 2002 circulation element it "requir[ed] adjacent property owners who sought to develop their properties to give the City the land through which the contemplated Parkway would run." This supports a finding that the project effect rule does not apply. (*Stamper, supra,* 1 Cal.5th at p. 604 ["[A] standard . . . dedication requirement imposed on multiple, similarly situated properties, tend[s] to show that the[ ] requirements predated and were imposed independently of a plan to condemn the property."].)

---

obtain Owners' strip by dedication rather than condemnation. In any event, we will accept 2006 as the date of probable inclusion.

9      We will apply the same standard of review as we did for the *Porterville* issue because both issues concern predominately legal applications of law to fact.

26

The fact that the 2002 dedication requirement arose four years before the date of probable inclusion also supports a finding that the project effect rule does not apply. (Cf. *Stamper*, *supra*, 1 Cal.5th at p. 604 ["a *short* period between the time the property is designated for public use and the time the agency first signals its intention to condemn the property may support an inference that inclusion was probable when the dedication requirement was put in place" (italics added)].)

Owners argue the specific dedication requirement did not arise until 2012, when the City amended the general plan to restrict access to the Property via Harmony Grove Road. We are not convinced. The 1993 ordinance and 2002 general plan and circulation element *already* required the same dedication. The 2012 amendment did not alter this preexisting requirement or signal that the City was suddenly more likely to condemn the strip than to eventually obtain it through dedication.

Owners argue more generally at a policy level that tying a general dedication ordinance to a circulation element "would subvert the very purpose of the project-effect rule" because "a city could ensure that any land it ultimately acquired for [circulation element] projects would be valued well below what it would have been had the city not contemplated including it in the project." But this is the very tension the *Stamper* court resolved by clarifying that the date of probable inclusion is the dividing line before which a city's general dedication requirements may obtain the benefit of the *Porterville* doctrine, and after which a landowner may obtain the benefit of the project effect rule. (*Stamper*, *supra*, 1 Cal.5th at pp. 603-604.)

Finally, "the reasonable expectations of the parties" (*Stamper*, *supra*, 1 Cal.5th at p. 604) support a finding that the project effect rule does not apply. Since at least 2002, the circulation element has shown the extension project

27

running through the Property, and other developers in the area have built out portions of the extension.  The 2006 PPH agreement further implemented the extension project and expressly contemplated that further implementation may come from developer contributions.  Thus, by the time Owners purchased the Property in 2007—with knowledge that the 2002 circulation element contemplated the extension would run through the Property—they should reasonably have expected that any development approval would be conditioned on their dedicating the strip to mitigate development impacts.

Moreover, from the City's perspective, it was the fact the extension ran through the Property that made the 2015 annexation feasible and desirable. Owners presumably benefited from the annexation because it resulted in up-zoning the Property from low-density residential use to industrial use.

Under these circumstances, applying the project effect rule to require that Owners be compensated for an industrial use of the strip that they should never reasonably have expected to make would result in the type of windfall the *Porterville* doctrine sought to avoid.  (See *Stamper*, *supra*, 1 Cal.5th at pp. 599-600 ["If the owner were compensated based on the highest and best use of the property, the owner would get a windfall—i.e., payment based on developed value for property that could not have been developed under any circumstances.  Such a result would be at odds with the Fifth Amendment principle that '[t]he owner is to be put in as good position pecuniarily as he would have occupied if his property had not been taken.' "].)

28

## II. No Precondemnation Damages

Owners also contend the trial court erred by finding they were not entitled to precondemnation damages.[10] We disagree.

### A. **Legal Principles**

In addition to paying just compensation for the actual condemnation of property, the condemner may also be liable for precondemnation damages if the owner can "demonstrate that (1) the public authority acted improperly either by unreasonably delaying eminent domain action following an announcement of intent to condemn or by other unreasonable conduct prior to condemnation; and (2) as a result of such action the property in question suffered a diminution in market value." (*Klopping v. City of Whittier* (1972) 8 Cal.3d 39, 52, fn. omitted; see *Dryden Oaks, LLC v. San Diego County Regional Airport Authority* (2017) 16 Cal.App.5th 383, 404; *Redevelopment Agency of San Diego v. Mesdaq* (2007) 154 Cal.App.4th 1111, 1134.)

"In order for any right to precondemnation damages to accrue . . . there must have been either some formal announcement by the condemning agency of its intention to condemn, or some other official act or expression of intent to acquire the property in question." (*Terminals Equipment Co. v. City and County of San Francisco* (1990) 221 Cal.App.3d 234, 245 (*Terminals Equipment*).) "The pivotal issue in every case is whether the public agency's activities have gone beyond the planning stage to reach the 'acquiring stage.'" (*Id.* at p. 246.)

---

10    The City contends Owners forfeited this challenge by failing to set forth in their opening brief all the relevant evidence on the issue. While it would have been helpful for Owners to have provided more details in their brief, we decline to declare a forfeiture.

A public entity is liable for precondemnation damages "only where it has acted *improperly and unreasonably*." (*City of Ripon v. Sweetin* (2002) 100 Cal.App.4th 887, 897.) "Whether the public entity has acted unreasonably is a question of fact . . . 'to be determined by the court.' " (*Ibid*.) If the court finds that liability exists, "the *amount* of damages" is then tried to a jury. (*Ibid*.)

We review the trial court's liability ruling for substantial evidence. (*People ex rel. Dept. of Transportation v. McNamara* (2013) 218 Cal.App.4th 1200, 1206.)

## B. **Analysis**

Using the City's March 23, 2016 adoption of the resolution of necessity to condemn the Property as the formal announcement against which to measure unreasonable delay, there certainly was none here—the City filed suit just two days later.

Not surprisingly, then, Owners argue the City's 2006 development agreement with PPH constituted the formal announcement because that is when the City "irrevocably commit[ed] itself to constructing the Citracado Parkway directly through the [Property]." (See *Terminals Equipment*, *supra*, 221 Cal.App.3d at p. 246 [moving to the 'acquiring stage' " can constitute a formal announcement].) Owners then contend the City's 10-year delay between entering into the PPH agreement and filing this condemnation suit "was unreasonable, having no colorable justification other than waiting to see whether [Owners] would give in before the City needed to file suit." The trial court disagreed, as do we.

Specifically, the trial court found "that any delay by the City in moving forward with [the extension project] was the result of general planning and was not unreasonable." Substantial evidence supports this finding. First,

30

the PPH agreement, itself, contemplated that it would take the City a considerable amount of time to complete the extension project—up to 10 years from the time the City obtained funding from all sources (including developers, like Owners, who would benefit from the extension).

Second, the City lacked authority to approve any development of the Property until 2015, when the City annexed it from the County. Moreover, until the annexation, the Property was zoned for low-density residential use. The City's up-zoning of the property to industrial use during the annexation undoubtedly benefited, rather than harmed, Owners.

Third, other than the 2009 tentative map proposal that Owners ultimately withdrew, Owners never sought City approval to develop the Property in any other manner. Although Owners contend it is improper to focus on their conduct instead of the City's, we fail to see how the City's delay could have unreasonably restrained Owners' development of the Property *if Owners never sought approval to develop it*. Indeed, it appears that if Owners had sought approval for a development that conformed to the general plan by incorporating the Citracado Parkway extension, the City would have approved it as it did for neighboring developments.

At its core, Owners' precondemnation damages claim is based not so much on the City's failure to condemn the strip *sooner*, but rather, on the notion that the City might condemn it *at all*. Owners' general partner testified he "would have preferred to not have Citracado on there and have a parcel . . . with no road going through." And he asserted the potential brewery tenant shared that sentiment. But a landowners' displeasure with the fact that a public entity's long-range planning documents contemplate some future public use of the owner's property does not give rise to a claim for precondemnation damages. (See *Selby Realty Co. v. City of San*

31

*Buenaventura* (1973) 10 Cal.3d 110, 119 ["The adoption of a general plan is several leagues short of a firm declaration of an intention to condemn property."].)

Owners also cite the City's 2012 general plan amendment restricting access to the Property from Harmony Grove Road as an instance of unreasonable delay in condemning the strip. But this only proves that Owners are more unhappy about the fact they must take their access from Citracado Parkway than that the City has delayed condemning the strip.

## DISPOSITION

The judgment is affirmed. The City is entitled to its costs on appeal.

HALLER, Acting P. J.

WE CONCUR:

AARON, J.

IRION, J.

# **APPENDIX**

## Exhibit 321.17



## Exhibit 343

